

# In the
# Missouri Court of Appeals
# Western District

THE LAMAR COMPANY, LLC, )
)
Appellant, ) WD79267
)
v. ) OPINION FILED: December 6, 2016
)
CITY OF COLUMBIA, MISSOURI, )
ET AL., )
)
Respondents. )

**Appeal from the Circuit Court of Boone County, Missouri**
The Honorable Gary M. Oxenhandler, Judge

Before Division One: Thomas H. Newton, Presiding Judge, Cynthia L. Martin, Judge
and Edward R. Ardini, Jr., Judge

The Lamar Company, LLC ("Lamar") appeals from the entry of summary judgment

in favor of the City of Columbia ("City") and individual defendants Timothy Teddy

("Teddy") and Shane Creech ("Creech") in Lamar's lawsuit for declaratory judgment,

breach of contract, and mandamus, premised on the enforceability of a 1998 settlement agreement. Because the 1998 settlement agreement was void *ab initio*,[1] we affirm.

## Factual and Procedural Background[2]

Lamar is an outdoor advertising company. Lamar acquired Whiteco Metrocom, Inc. ("Whiteco"), another outdoor advertising company, in 1999. As Whiteco's successor, Lamar assumed Whiteco's rights and obligations described in a May 1998 Stipulation for Settlement Agreement ("Agreement") between Whiteco and City.

The Agreement resolved a 1994 lawsuit filed by Whiteco[3] after City denied four applications for permits to erect new billboards. Whiteco claimed that denial of the applications was arbitrary and capricious, and that City's billboard ordinances[4] were

---

[1]"[A] contract which is declared void *ab initio* is 'null from the beginning if it seriously offends law or public policy.'" *Crewse v. Shelter Mut. Ins. Co.*, 706 S.W.2d 35, 38 (Mo. App. W.D. 1985) (quoting *Black's Law Dictionary* 1411 (5th Ed. 1979)).

[2]The factual background is drawn from uncontroverted facts set forth in the parties' competing motions for summary judgment that were either admitted or deemed admitted by operation of Rule 74.04.

Several uncontroverted facts asserted by Lamar in its motion for partial summary judgment are supported by an Affidavit from John McWhirter. Affidavits are expressly permitted as support for uncontroverted facts by Rule 74.04(c)(1). The affidavit must comply with Rule 74.04(e). A denial of an uncontroverted fact supported by an affidavit must itself be supported by specific references to discovery, exhibits, or affidavits that demonstrate specific facts showing that there is a genuine issue for trial, Rule 74.04(c)(2). City's responses to nearly all of Lamar's factual allegations supported by the Affidavit of John McWhirter failed to comply with Rule 74.04(c)(2). The truth of these alleged uncontroverted facts is deemed admitted by City. Rule 74.04(c)(2).

Some uncontroverted facts set forth in Lamar's motion for partial summary judgment address the meaning of the Agreement or of other documents. *See, e.g.*, Legal File, p. 0180, ¶ 43 (Lamar's statement of uncontroverted facts addressing whether a provision of the Agreement is a condition precedent). "Legal conclusions cannot be pleaded as ultimate facts." *Jordan v. Peet*, 409 S.W.3d 553, 560 (Mo. App. W.D. 2013) (quotation omitted). Legal conclusions in a motion for summary judgment, even if deemed admitted, are not binding on the court. *Id.*

We need not itemize which of Lamar's uncontroverted facts are deemed admitted by City by operation of Rule 74.04, and which of Lamar's uncontroverted facts, even if deemed admitted by City, are not binding on this court because they express legal conclusions. Even viewed in the light most favorable to Lamar, none of the involved uncontroverted facts bear on our determination that the Agreement is void *ab initio*.

[3]Another outdoor advertising company, Robinson Displays, Inc., was also a plaintiff in the lawsuit, and a party to the Agreement. Robinson Displays, Inc. is not a party to the litigation giving rise to this appeal.

[4]The challenged ordinances were ordinance number 13191, adopted in December 1991, which prohibited the erection of all off-premise outdoor advertising signs within city limits; ordinance number 14190, adopted in August 1994, which placed a moratorium on new billboards until another ordinance could be passed; and ordinance number 14205, adopted in September 1994, which imposed size, height, and other restrictions on billboards within city limits. Ordinance numbers 14190 and 14205 were enacted **after** Whiteco's permit applications were filed.

2

unlawful in light of the Missouri Billboard Act,[5] which describes authorized restrictions on outdoor signs erected within 660 feet of the nearest edge of the right-of-way of any highway. Following the entry of partial summary judgment in favor of Whiteco on the issue of liability, Whiteco and City entered into the Agreement. Pursuant to the Agreement:

- Whiteco agreed to dismiss its lawsuit with prejudice, and agreed not to challenge the validity or constitutionality of current City billboard regulations, or future regulations so long as they are less restrictive.

- Whiteco agreed to waive its claim for damages.

- City agreed to issue permits for three new billboards subject only to compliance with City's electrical and wind load requirements and state statutes.

- Whiteco and City agreed that forty-two of Whiteco's billboards (thirty-nine existing billboards and the three new billboards promised by the Agreement) would be subject to a "cap and replace" agreement. Whiteco would be permitted to rebuild in the same location, or remove and relocate to a new location, any of the forty-two billboards identified in the Agreement, subject only to compliance with state statutes and City wind load and electrical requirements. Whiteco could apply to build additional billboards beyond the forty-two described in the Agreement, but those applications would be subject to compliance with City's then existing billboard ordinance.

In July 1998, shortly after the Agreement was executed, Whiteco's applications for three new billboards were approved by City. In February 2005, after Lamar acquired Whiteco, City approved Lamar's application to remove and relocate one of the forty-two billboards described in the Agreement.

---

[5]The Missouri Billboard Act is found at sections 226.500 to 226.600.

On May 6, 2014, Lamar applied for permits to either rebuild in the same location, or to remove and relocate to new locations, eight of the forty-two billboards described in the Agreement. On May 27, 2014, and June 2, 2014, City denied the applications in writing, because the proposed billboards did not meet the requirements of City's billboard ordinance.[6] On June 17, 2014, Lamar requested an appeal to City's Board of Adjustment. Lamar's request was "based on a settlement agreement executed by [City] in 1998 which exempts permits to replace 42 signs owned by Whiteco [] from all city ordinances but windload [sic] and electrical requirements." In other words, Lamar argued that the Agreement required City to approve its applications. Lamar's request for an appeal did not challenge the determination that Lamar's applications failed to meet the requirements of City's billboard ordinance. City denied Lamar's request for an appeal because determining the enforceability of the Agreement exceeded the scope of matters that could be heard by City's Board of Adjustment.

On June 24, 2014, Lamar filed suit against City, Teddy, and Creech. An amended petition was filed on November 24, 2014 (hereinafter "Petition"). The Petition sought a declaratory judgment that the Agreement is valid and enforceable, and entitled Lamar to the permits for which it had applied; a judgment for breach of contract (the Agreement) with a remedy of specific enforcement; a judgment for breach of contract (the Agreement) with a remedy of monetary damages; and a writ of mandamus compelling Teddy (City's Community Development Director) and Creech (City's Building and Development

---

[6]The billboard ordinance in effect at the time of City's denials, referred to in City's denial letters as Section 23-16 of City's Code of Ordinances, includes restrictions that are represented by the parties to be identical in all material respects to those set forth in ordinance number 14205.

4

Manager) to issue the applied for permits should the Agreement be declared valid and enforceable. The Petition did not challenge City's determination that Lamar's permit applications did not meet the requirements of City's billboard ordinance.

City and the individual defendants asserted an affirmative defense that the Agreement was void *ab initio* because it impermissibly contracted away City's police powers. Lamar filed an avoidance to this affirmative defense, alleging that City was equitably estopped from denying the validity and enforceability of the Agreement.[7]

City[8] filed a motion for summary judgment as to all counts in the Petition which argued that the Agreement was *ultra vires* and void *ab initio* because it impermissibly contracted away City's police powers. City's motion also argued that the doctrine of equitable estoppel could not be relied on to enforce a void municipal contract. Lamar filed a motion for partial summary judgment on the issue of liability which argued that City was equitably estopped to deny the validity and enforceability of the Agreement, and that City's denial of Lamar's permit applications was a breach of the Agreement that entitled Lamar to a writ of mandamus compelling issuance of the permits.

Following argument on the competing summary judgment motions, the trial court entered its judgment ("Judgment") concluding that the Agreement violated section 432.070[9] because it exceeded the scope of City's powers by contracting away police powers. The Judgment concluded that the Agreement was therefore void *ab initio*. The

---

[7]Equitable estoppel is an affirmative defense. *Ryan v. Ford*, 16 S.W.3d 644, 651 (Mo. App. W.D. 2000).
[8]For ease of reference, City and the individual defendants are hereinafter collectively referred to as "City," as their legal positions in defending Lamar's lawsuit were aligned, and as the individual defendants' exposure, if any, on Lamar's claim for writ of mandamus depended on the validity and enforceability of the Agreement.
[9]All statutory references are to RSMo 2000 as supplemented unless otherwise noted.

Judgment further concluded that the doctrine of equitable estoppel could not be relied on to enforce a void municipal contract. Finally, the Judgment found that mandamus could not lie against the individual defendants because the Agreement was void.[10] The trial court granted City's motion for summary judgment, denied Lamar's motion for partial summary judgment, and entered judgment in favor of City and against Lamar on all of Lamar's claims. The effect of the Judgment was to resolve all issues as to all parties.[11]

Lamar filed a motion for new trial or in the alternative to alter or amend the judgment. The Judgment was amended to correct an exhibit reference,[12] but Lamar's motion was denied in all other respects. Lamar then filed this timely appeal.

## Summary of Points on Appeal

Lamar raises four points on appeal. The points respectively argue that it was error for the trial court to conclude that the Agreement was void *ab initio* because: (1) the Agreement was lawful when enacted, was supported by consideration, and was approved in writing as contemplated by section 432.070; (2) the Agreement addressed matters not

---

[10]The trial court's grant of judgment in favor of City on Lamar's claim for writ of mandamus is not the subject of this appeal. We take advantage of this opportunity, however, to remind that mandamus is an extraordinary writ, and that the procedures for securing same differ from normal civil actions. *U.S. Dept. of Veterans Affairs v. Boresi*, 396 S.W.3d 356, 359 n.1 (Mo. banc 2013). Those procedures were not followed in this case. Moreover, as pled, Lamar's claim for writ of mandamus belied entitlement to same, as the Petition acknowledged the right to insist on issuance of a permit depended on a determination that had not yet been made regarding the Agreement's validity. "A litigant asking relief by mandamus must allege and prove that he has a clear, unequivocal, specific right to a thing claimed. He must show himself possessed of a clear and legal right to the remedy." *Furlong Companies, Inc. v. City of Kansas City*, 189 S.W.3d 157, 165 (Mo. banc 2006). "The writ's purpose is to execute, not to adjudicate" a legal right. *Lemay v. Fire Protection Dist.*, 340 S.W.3d 292, 295 (Mo. App. E.D. 2011) (citations omitted).

[11]The Judgment's last sentence states that it "may be subject to immediate appeal pursuant to Civil Rule 74.01(b)." Rule 74.01(b) addresses appeals from interlocutory judgments resolving less than all issues as to all parties. Because the Judgment's grant of City's motion for summary judgment resolved all issues as to all parties, it was not an interlocutory judgment, but a final judgment. The Judgment's reference to Rule 74.01(b) is superfluous.

[12]An amended judgment was entered on December 10, 2015. Our references to the trial court's Judgment hereinafter refer to the December 10, 2015 amended judgment.

necessary to the exercise of City's police powers such that refusing to enforce the Agreement unlawfully impaired a contract; (3) City is equitably estopped from denying the validity and enforceability of the Agreement, having accepted the benefits of the Agreement, and because to conclude otherwise would result in a manifest injustice; and (4) controverted facts and an absence of material uncontroverted facts demonstrate no support in the record for the conclusion that the Agreement hinders public health, welfare, or safety, or for the conclusion that there was a "significant variance" between City's billboard ordinance and the eight applications filed by Lamar.

## Standard of Review

Before addressing the merits of Lamar's points on appeal, we address our standard of review, a subject that is contested by the parties. Lamar contends that our standard of review is *de novo*, as we are reviewing the trial court's grant of summary judgment. City argues that Lamar's motion for new trial converted the proceeding to a court-tried case which we review only for abuse of discretion.[13]

City's argument originates from a misreading of the Missouri Supreme Court's decision in *Central Trust & Investment Co. v. SignalPoint Asset Management, LLC*, 422 S.W.3d 312 (Mo. banc 2014). In *Central Trust*, a trial court entered summary judgment in favor of SignalPoint on Central Trust's tort claims. *Id.* at 319. Central Trust filed a motion for reconsideration based on newly discovered evidence, which was denied. *Id.* Central Trust appealed, arguing that the grant of summary judgment was erroneous, and that denial

---

[13]City filed a motion to strike and dismiss Lamar's appeal on the basis that Lamar's appeal purposefully misled this court about the proper standard of review. City's motion to strike and dismiss is wholly without merit, and is denied.

7

of its motion for reconsideration based on newly discovered evidence was erroneous. *Id.* at 316-17. The Supreme Court treated the motion for reconsideration as tantamount to a motion for new trial. *Id.* at 325. The Supreme Court observed that "[a] party can move for a new trial following the entry of summary judgment; the motion is considered a motion for new trial in a court-tried case." *Id.* (citing *Taylor v. United Parcel Serv., Inc.*, 854 S.W.2d 390, 393 (Mo. banc 1993)).[14] The Supreme Court also observed that "a circuit court's judgment overruling a new trial motion [is reviewed for] abuse of discretion." *Id.* (citing *Badahman v. Catering St. Louis*, 395 S.W.3d 29, 39 (Mo. banc 2013)).

Though *Central Trust* held that appellate review of the denial of a motion for new trial in a court-tried case is for abuse of discretion, it did not hold that every claim of error raised on appeal following the denial of a motion for new trial in a court-tried case is subject to review for abuse of discretion. Specifically, *Central Trust* did not hold that a trial court's grant of summary judgment is subject to review for abuse of discretion if the non-movant files an unsuccessful motion for new trial. In fact, the Supreme Court reviewed Central Trust's claim of error involving the grant of summary judgment employing the settled *de novo* standard of review described in *ITT Commercial Finance Corp. v. Mid-Am Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993), and reiterated in *Goerlitz v. City of*

---

[14]*Taylor v. United Parcel Service, Inc.*, held that a motion for reconsideration filed after the grant of summary judgment is, in effect, a motion for new trial, and is thus an authorized "after trial motion" for purposes of calculating the time for filing a notice of appeal. 854 S.W.2d 390, 393 (Mo. banc 1993). In so concluding, *Taylor* observed that "[f]or purposes of the rules, a summary judgment proceeding is a trial because it results in 'a judicial examination and determination of the issues between the parties.'" *Id.* (quoting *Tittsworth v. Chaffin*, 741 S.W.2d 314, 317 (Mo. App. S.D. 1987)).

8

*Maryville*, 333 S.W.3d 450, 452-53 (Mo. banc 2011). *Central Trust*, 422 S.W.3d at 319-20. *Central Trust* observed that:

> The trial court makes its decision to grant summary judgment based on the pleadings, record submitted, and the law; therefore, this Court need not defer to the trial court's determination and reviews the grant of summary judgment *de novo*.

*Id*. at 319 (quoting *Goerlitz*, 333 S.W.3d at 452).

In this case, Lamar has not appealed the trial court's denial of its motion for new trial. Lamar has appealed the Judgment's grant of City's motion for summary judgment. It borders on frivolous to contend that our standard of review of the grant of summary judgment is varied by the procedural fortuity of an unsuccessful motion for new trial. Rather, regardless whether a non-movant files an unsuccessful motion for new trial, where the grant of summary judgment is challenged on appeal, our standard of review requires us to determine whether the trial court properly applied the law to uncontroverted facts to enter judgment as a matter of law—an obvious question of law that is subject to *de novo* review.

As such, our standard of review in this appeal is *de novo*. In conducting *de novo* review of the trial court's grant of summary judgment, we abide by the following standards:

> Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law. [*ITT Commercial Fin*., 854 S.W.2d at 376.] The facts contained in affidavits or otherwise in support of a party's motion are accepted "as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id*. Only genuine disputes as to material facts preclude summary judgment. *Id*. at 378. A material fact in the context of summary judgment is one from which the right to judgment flows. *Id*.

9

A defending party . . . may establish a right to summary judgment by demonstrating: (1) facts negating any one of the elements of the non-movant's claim; (2) "that the non-movant, after an adequate period for discovery, has not been able and will not be able to produce sufficient evidence to allow the trier of fact to find the existence of any one" of the elements of the non-movant's claim; or (3) "that there is no genuine dispute as to the existence of the facts necessary to support movant's properly pleaded affirmative defense." *Id*. at 381. Each of these three methods individually "establishes the right to judgment as a matter of law." *Id*.

. . .

"The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record. However, facts contained in affidavits or otherwise in support of the party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion." *Hammack v. Coffelt Land Title, Inc*., 284 S.W.3d 175, 177-78 (Mo. App. W.D. 2009) (internal quotations and citations omitted). *See also ITT Commercial Fin*., 854 S.W.2d at 376.

*Central Trust*, 422 S.W.3d at 319-20 (quoting *Goerlitz*, 333 S.W.3d at 452-53). "In addition, the non-movant must support denials with specific references to discovery, exhibits, or affidavits demonstrating a genuine factual issue for trial." *Id*. at 320 (citing Rule 74.04(c)(2), (c)(4)). "Facts not properly supported under Rule 74.04(c)(2) or (c)(4) are deemed admitted." *Id*.

Having settled the disagreement over our standard of review, we proceed with our discussion of the merits of Lamar's points on appeal.

### Point One

Lamar argues that it was error to conclude that the Agreement was void *ab initio* because the Agreement was lawful when enacted, was supported by consideration, and was approved in writing as contemplated by section 432.070.

10

The trial court found that the Agreement was void *ab initio* pursuant to section 432.070 because it "bargains and contracts away [City's] police powers and is therefore beyond the scope of its powers." Section 432.070 provides:

> No county, city, town, village, school township, school district or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of the contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing.

Section 432.070 thus imposes three requirements: a contract must be within the scope of the governmental entity's powers, for proper consideration, and duly authorized and in writing. The statutory requirements with respect to contracts with municipalities are "mandatory, not merely directory." *Donovan v. Kansas City*, 175 S.W.2d 874, 881 (Mo. banc 1943) (addressing predecessor to section 432.070, R.S.A. section 3349).

> By statutory prohibition . . . municipal contracts not within the scope of the municipality's powers, contracts not expressly authorized by law, and contracts, including the consideration, not in writing, dated when made and subscribed by the parties or their authorized agents are placed on the same legal footing. Under the statute it is as much ultra vires for a Missouri municipality to incur a liability in the nature of a contractual obligation in the absence of a writing as to incur a liability not within the scope of its corporate powers or one not expressly authorized by law.

*Id*. at 882.

"Due to the fact that municipalities represent the public, the courts unhesitatingly should enforce compliance with all mandatory provisions of the statutes intended to protect municipalities and their inhabitants." *St. Charles Cty. v. A Joint Bd. Or Comm'n*, 184 S.W.3d 161, 165 (Mo. App. E.D. 2006). Thus, a contract which fails to satisfy any one of

11

the mandatory requirements described in section 432.070 is "outside the object of its creation . . . and therefore beyond the powers conferred upon it by the Legislature," and "is not voidable only, but wholly void, and of no legal effect." *Id*. at 166 (quoting *Donovan*, 175 S.W.2d at 879); *see also Gill Constr., Inc. v. 18th & Vine Auth*., 157 S.W.3d 699, 708 (Mo. App. W.D. 2004) (holding that a contract made in violation of section 432.070 is void rather than voidable).

City's motion for summary judgment did not contend that the Agreement was void because it failed to satisfy the consideration or writing requirements described in section 432.070. Correspondingly, the Judgment neither addressed nor found that the Agreement was void because it failed to satisfy the consideration or writing requirements described in section 432.070. Lamar's discussion of these requirements in its first point on appeal is superfluous, as neither requirement is implicated by the Judgment. In fact, a cursory review of the summary judgment record reveals that these statutory requirements were satisfied, and have never been challenged.

Instead, City's motion for summary judgment, and the Judgment, implicate only the statutory requirement that a contract "shall be within the scope of [a city's] powers or be expressly authorized by law." Section 432.070. City argued, and the trial court agreed, that the Agreement exceeded the scope of City's powers because it contracted away City's police powers by requiring City to authorize the replacement or relocation of billboards without regard to its zoning ordinances. City argued, and the trial court agreed, that as a result, the Agreement was void *ab initio*.

12

The law in this regard is settled. "A city cannot surrender or contract away its governmental functions and [police] powers." *Lodge of the Ozarks, Inc. v. City of Branson*, 796 S.W.2d 646, 650 (Mo. App. S.D. 1990) (citing *Stewart v. City of Springfield*, 165 S.W.2d 626, 629 (Mo. banc 1942)). "Police power is the exercise of the sovereign right of a government to promote order, safety, health, morals, and the general welfare of society, within constitutional limits." *Marshall v. Kansas City*, 355 S.W.2d 877, 883 (Mo. banc 1962) (quotation omitted). "The police power is an essential attribute of government without which constitutional guaranties of personal and property rights would be ineffective and meaningless." *Id.* "The police power of [a] city cannot be bargained away by contract, but must at all times be available for use to meet such public needs as may arise." *North Kansas City Sch. Dist. v. J.A. Peterson-Renner, Inc.*, 369 S.W.2d 159, 165 (Mo. 1963). "If an existing contract should have the effect of interfering [with the proper exercise of the police power], it must necessarily give way to an appropriate exercise of the police power." *State ex rel. Kansas City v. Pub. Serv. Comm'n*, 524 S.W.2d 855, 859 (Mo. banc 1975). In other words, if a contract surrenders or contracts away governmental functions, then it exceeds the scope of a governmental entity's powers, and is void. *Stewart*, 165 S.W.2d at 629 (addressing predecessor to section 432.070, R.S.A. section 3349).

"Zoning ordinances constitute an exercise of a state's police power." *Moore v. City of Parkville*, 156 S.W.3d 384, 387 (Mo. App. W.D. 2005) (citing *City of Louisiana v. Branham*, 969 S.W.2d 332, 336 (Mo. App. E.D. 1998)). The power to zone stems from Article IV, Section 37 of the Missouri Constitution, which provides, in pertinent part, that:

13

> The health and general welfare of the people are matters of primary public concern; and to secure them . . . the general assembly may grant power with respect thereto to counties, cities or other political subdivisions of the state.

Consistent with this constitutional provision, the General Assembly has delegated the police power to regulate land use to counties, cities and other political subdivisions. "Missouri's Zoning Enabling Act, sections 89.010 through 89.140, is the sole source of power and measure of authority for a city, town, or village in zoning matters." *Moore*, 156 S.W.3d at 387 (citing *City of Louisiana*, 969 S.W.2d at 336). "Section 89.050 grants municipal legislative bodies the power to determine the manner in which zoning regulations shall be established and amended." *Id.* Section 89.040 grants municipal legislative bodies the authority to enact regulations for any number of specified purposes, including, without limitation, "to promote health and general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to preserve features of historical significance; to facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements." Section 89.040. "Such regulations shall be made with reasonable consideration, among other things, to . . . encouraging the most appropriate use of land throughout such municipality." *Id.*

City's billboard ordinance was enacted pursuant to its delegated zoning police powers. The plain language of the Agreement prohibited the City from enforcing its billboard ordinance, save wind load and electrical requirements, should Whiteco or its successors apply to rebuild in the same location, or to relocate in a new location, any of the forty-two billboards identified in the Agreement. Applying the settled principles above,

14

the Agreement had "the effect of interfering [with the proper exercise of City's police power], [and] must necessarily give way to an appropriate exercise of [City's] police power." *State ex rel. Kansas City*, 524 S.W.2d at 859. Because City had no authority to contract away future enforcement of its zoning ordinance against rebuilt or relocated billboards, the Agreement exceeded the scope of City's powers in violation of section 432.070, and is void. *North Kansas City Sch. Dist.*, 369 S.W.2d at 165 (holding that "any attempt by way of contract to deprive [a] city of . . . control [over exercise of it police powers] is void"); Edward H. Ziegler, Jr., 3 *Rathkopf's The Law of Zoning and Planning* section 39:27 (4th ed. Supp. 2006) ("[A]n agreement relating to future zoning action is likely to be held void as illegal contract zoning which bargains away a municipality's police power.").

Lamar does not challenge that zoning regulations constitute an exercise of a municipality's police powers. And Lamar does not challenge the settled principle that a municipality cannot surrender or contract away its governmental functions and police powers without violating section 432.070. Instead, Lamar disagrees with the conclusion that the Agreement interfered with City's exercise of its police powers. Lamar argues that when the Agreement was executed in 1998, it did not contract away zoning authority lawfully possessed by City at that time. We disagree.

When Whiteco applied for four billboard permits in 1994, City's billboard ordinance then in effect, ordinance number 13191, prohibited the erection of *all* off-premise outdoor advertising signs within city limits. Section 226.500 of the Missouri Billboard Act then in effect directed that "the erection and maintenance of outdoor advertising in areas adjacent

15

to the interstate and primary highway systems [shall] be regulated in accordance with sections 226.500 to 226.600 and rules and regulations promulgated by the state highways and transportation commission."  Whiteco's applications were for four new billboards in locations that were subject to the Missouri Billboard Act.

The City could not have relied on ordinance number 13191 in 1994 to lawfully deny Whiteco's applications.  Existing precedent established that municipal ordinances banning *all* outdoor advertising signs were preempted by the Missouri Billboard Act.  *See Nat'l Advert. Co. v. Missouri State Highway & Transp. Comm'n*, 862 S.W.2d 953, 955-56 (Mo. App. E.D. 1993) (holding that a "complete prohibition" on outdoor advertising signs imposed by a municipal ordinance is preempted by the Missouri Billboard Act).  *National Advertising* did not expressly address, however, whether a city could enforce restrictions short of an outright ban on outdoor advertising signs without running afoul of the Missouri Billboard Act.

Thus, while Whiteco's applications were pending, City imposed a moratorium on outdoor signage applications by ordinance number 14190, and then enacted ordinance number 14205 in September 1994, imposing size, height, and other restrictions on billboards within city limits.  City then relied on ordinance number 14205 to deny Whiteco's pending applications.

Whiteco filed suit in 1994.  Two years later, and while Whiteco's lawsuit was pending, the Eastern District held in *Outcom, Inc. v. City of Lake St. Louis*, that although municipal billboard ordinances could regulate billboards beyond 660 feet of the highway right-a-way, "ordinance regulations for size, lighting and spacing of signs" were void if

16

applied to billboards within 660 feet of the highway right-a-way by virtue of the Missouri Billboard Act. 960 S.W.2d 1, 4-5 (Mo. App. E.D. 1996). *Outcom* thus called into question the lawfulness of ordinance number 14205.

In 1998, Whiteco secured a partial summary judgment on the issue of liability which declared all three of City's billboard ordinances to be arbitrary, capricious, and unlawful as applied to Whiteco's applications. However, by the time partial summary judgment was entered, the General Assembly had enacted section 71.288. As originally enacted in 1997, section 71.288 provided, in pertinent part, as follows:

> Any city that maintains the city engineer or other similar city official . . . shall have the authority to place any restriction upon the height, spacing and lighting of outdoor advertising structures placed within the view of any highway within the city. ***Such ordinance may be more restrictive than [the Missouri Billboard Act]***.

(Emphasis added). There is no indication in the summary judgment record that the trial court in the Whiteco lawsuit considered section 71.288 before entering partial summary judgment in favor of Whiteco.

Regardless, Lamar admits in this appeal that as a result of the General Assembly's enactment of section 71.288 in 1997, "City . . . had available the option under [section] 71.288 . . . [to] . . . further restrict . . . what [] City might require of Whiteco" with respect to future applications to rebuild or relocate signs specified in the Agreement. [Appellant's Brief, p. 20] Lamar draws misdirected significance from this fact by arguing that although City could have done so, it failed to incorporate into the Agreement other lawful restrictions on future "cap and replace" applications beyond City's wind load and electrical

17

requirements.[15]  The real significance of Lamar's concession, however, is in its essential recognition that at the time of the Agreement, City possessed lawful zoning authority to restrict Whiteco's future billboard applications in a manner more restrictive than the Missouri Billboard Act, and in a manner that was broader than the rights City retained in the Agreement.  In other words, the Agreement **contracted away** City's lawful zoning authority with respect to future applications to rebuild or relocate any of the forty-two signs identified in the Agreement.  *See* Hon. Richard S. Cohen *et. al.*, *Settling Land Use Litigation While Protecting the Public Interest: Whose Lawsuit Is This Anyway?*, 23 Seton Hall L. Rev. 844, 852 (1993) ("Where litigation ensues, the [municipality's] power to settle would logically seem to follow.  The resolution of a dispute in a manner facially inconsistent with duly adopted ordinances, however, raises serious concerns."); 56 Am. Jur. 2d *Municipal Corporations* section 813 (1976) (recognizing that a municipality cannot bargain away duties it owes to the public).

Despite this concession, Lamar incongruently argues that the Agreement did not contract away City's lawful police powers because section 71.288 was not construed to be lawful until this court's decision in *State ex rel. Ad Trend, Inc. v. City of Platte City*, 272 S.W.3d 201 (Mo. App. W.D. 2008).  *Ad Trend* observed that "[t]he regulations in section 226.540 provide a set of default standards for new billboard construction, and section

---

[15]During oral argument, Lamar argued that City was "expressly authorized by law" to enter into the Agreement by section 71.288, rendering the Agreement lawful pursuant to section 432.070.  Lamar's argument ignores that the sole source of City's power and authority to enact land use regulations is pursuant to Missouri's Zoning Enabling Act, sections 89.010 through 89.140.  *Moore*, 156 S.W.3d at 387 (citing *City of Louisiana*, 969 S.W.2d at 336).  Though section 71.288 addresses the proper scope of municipal regulations involving billboards, it does not authorize a municipality to bypass delegated zoning police powers (including procedures required to lawfully enact a zoning ordinance) by entering into a contract.

71.288 grants authority to cities and counties to pass more restrictive ordinances." *Id.* at 204. Lamar argues that it would be erroneous to "retroactively" apply the holding in *Ad Trend* to find the Agreement void. We disagree. *Ad Trend* did not make new law. It simply represented an opportunity for a Missouri court to discuss the plain and unambiguous language of section 71.288.

It is true that *Ad Trend* addressed section 71.288 as amended in 1998, an amendment that took effect after the Agreement was entered into. This is of no significance, however. The amended version of section 71.288, which remains in effect today, provides, in pertinent part, as follows:

> 1. Any city or county shall have the authority to adopt regulations with respect to outdoor advertising that are more restrictive than the height, size, lighting and spacing provisions of [the Missouri Billboard Act].

The differences between section 71.288 as originally enacted in 1997 and as amended in 1998[16] are not material to this case. Both versions of the statute plainly and unambiguously authorized municipalities to regulate billboards in a manner that is more restrictive than the Missouri Billboard Act. Indicative of this point, in *State ex rel. Drury Displays, Inc. v. City of Shrewsbury*, 985 S.W.2d 797, 800 (Mo. App. E.D. 1998), the Eastern District, addressing section 71.288 *as originally enacted*, ruled that "[s]ection 226.540 [of the Missouri Billboard Act] no longer stands as a bar" to more restrictive municipal regulation of billboards within 660 feet of the highway right-a-way. Lamar's contention that the

---

[16]The 1998 amendment to section 71.288 added "size" as an additional subject that could be more restrictively regulated by municipalities, and deleted reference to the need for a city engineer or similar official to be a participant in the process.

Agreement was lawful when it was entered into because it did not contract away police power possessed by City at the time is without merit.[17]

We similarly reject Lamar's related argument that the Agreement did not contract away City's police power because, in substance, it did no more than grandfather signs already in place, as the constraints it expressed on future rebuilding or relocating were limited to those the law authorized City to enforce at the time. We have already explained that the constraints on future rebuilding or relocating were not merely those included in the Agreement (City's wind load and electrical requirements), but included as well other constraints authorized by the plain language of section 71.288 as enacted in 1997, a fact Lamar's Brief concedes.

Moreover, we do not agree that the substance of the Agreement was to "grandfather" existing uses. "Grandfathering" refers to the practice of exempting a land use from current zoning regulations because the use complied with regulations in effect at the time the use commenced. *Rose v. Bd. of Zoning Adjustment Platte Cty.*, 68 S.W.3d 507, 515 (Mo. App. W.D. 2001) ("The term 'nonconforming use' means a use of land which lawfully existed prior to the enactment of a zoning ordinance and which is maintained after the effective date of the ordinance even though not in compliance with the new use restriction."). "The theory behind the nonconforming use doctrine is that applying new zoning restrictions to established uses of land would constitute a taking of private property without just

---

[17]Because Lamar's contention is without merit, we need not address whether its premise is legally sound. Lamar cites no authority addressing whether a contract that does not exceed the scope of a governmental entity's powers when entered into can nonetheless be declared void pursuant to section 432.070 because a subsequent development in the law declares or renders the subject or effect of the contract to be in excess of the governmental entity's powers.

20

compensation or due process." *Storage Masters-Chesterfield, L.L.C. v. City of Chesterfield*, 27 S.W.3d 862, 866 (Mo. App. E.D. 2000). "As such, the prior use which is now considered 'nonconforming' is deemed legal or lawful and is allowed to continue albeit in violation of current zoning laws." *Williams v. Dep't of Bldg. Dev. Servs.*, 192 S.W.3d 545, 548 (Mo. App. S.D. 2006) (citing *Rose*, 68 S.W.3d at 515; *Storage Masters-Chesterfield*, 27 S.W.3d at 865-66) (other citation omitted).

The Whiteco lawsuit was filed because the City denied four applications for *new* billboards. The Agreement assured Whiteco and it successors that *future* applications for three *new* signs, or to *rebuild or relocate* any of the forty-two signs identified in the Agreement, would be approved regardless whether in nonconformance with City's then existing sign ordinance. New signs, rebuilt signs, and relocated signs are not "grandfathered" nonconforming uses. Instead, "the spirit of zoning ordinances always has been and still is to diminish and decrease nonconforming uses." *Heck v. City of Pacific*, 447 S.W.3d 202, 205-06 (Mo. App. E.D. 2014) (citing *Hoffman v. Kinealy*, 389 S.W.2d 745, 750 (Mo. banc 1965)). As a result, "Missouri courts . . . allow[] municipalities to regulate and limit nonconforming uses by various means such as prohibiting the resumption of a nonconforming use after its abandonment or discontinuance, prohibiting the rebuilding or alteration of nonconforming structures or structures occupied for nonconforming uses, and prohibiting or rigidly restricting a change from one nonconforming use to another." *Id.* at 206 (citing *City of Sugar Creek v. Reese*, 969 S.W.2d 888, 891 (Mo. App. W.D. 1998)). The Agreement prevented City from diminishing and decreasing nonconforming billboards by relieving applications to rebuild or relocate any

21

of the forty-two signs identified in the Agreement from the obligation to abide by City's then existing billboard ordinance. This further demonstrates how the Agreement operated to hinder City's zoning authority, in excess of City's powers, and in violation of section 432.070.

In light of the foregoing discussion, the Agreement plainly "surrender[ed] or contract[ed] away [City's] governmental functions and [police] powers." *Lodge of the Ozarks, Inc.*, 796 S.W.2d at 650 (citing *Stewart*, 165 S.W.2d at 629). The trial court did not error in concluding that the Agreement exceeded the scope of City's powers in violation of section 432.070, rendering it void *ab initio*.

Point One is denied.

## Point Two

Lamar argues that it was error for the trial court to conclude that the Agreement was void *ab initio* because the Agreement addressed matters not necessary to the exercise of City's police powers such that refusing to enforce the Agreement unlawfully impaired a contract.

Lamar's point relied on expressly relies on *State ex rel. Kansas City*, 524 S.W.2d 855. In the argument portion of its Brief, Lamar contends that *State ex rel. Kansas City* stands for two propositions: that "the police power is not so powerful that it impairs the obligations of contracts where such impairment is not necessary to achievement of the objective for which the power is being expressed;" and it is necessary as a condition to abrogating existing contractual rights to establish that the police power in fact was hindered. *Id*. at 864; [Appellant's Brief, p. 26]

22

Lamar relies on these principles to argue that it was unnecessary to invalidate the Agreement because the City's objective in entering into the Agreement was to "salvage its Sign Code and limit Whiteco's ability to construct new outdoor advertising signs," an objective that was in fact accomplished, and an objective that is consistent with exercise, not hindrance of, City's police power. [Appellant's Brief, p. 26]

Lamar's argument is flawed. Lamar candidly (and accurately) concedes, as explained in our discussion of Point One, *supra*, that when the Agreement was entered into in 1998, section 71.288 afforded City the lawful right to impose more restrictive regulations on the height, spacing, and lighting of Whiteco's billboards than those imposed by the Missouri Billboard Act or by the Agreement. Lamar's attribution of an "objective" to the City of a desire to enter into the Agreement to "salvage its Sign Code" is mere conjecture, and is highly suspect given the effect of the plain language of section 71.288. Even if Lamar's conjecture is accepted as true, Lamar is in essence arguing that City acted within the scope of its powers by contracting away zoning authority over Whiteco and its successors because by doing so, it preserved the ability to exercise its police powers to regulate other billboard applicants. Lamar cites no authority for the proposition that selective hindering of zoning authority is within the scope of a municipality's powers, and *State ex rel. Kansas City*, the case Lamar cites as authoritative, does not support this proposition.

In *State ex rel. Kansas City*, the Missouri Supreme Court discussed the intersection between a city's general authority to contract and its inability to contract away police powers. Kansas City and a railroad had entered into a contract wherein the railroad agreed

23

to pay all costs to maintain and operate rail lines in the city, in exchange for the city's extension of a franchise to do so. *State ex rel. Kansas City*, 524 S.W.2d at 856. Some years later, the Public Service Commission, relying on statutory authority extended to it by the General Assembly *after* the aforesaid agreement had been entered into, ordered Kansas City and the railroad to reconstruct two viaducts as a matter of public safety, and directed Kansas City to pay 90% of the cost to do so. *Id*. at 857-58. Kansas City appealed, arguing its contract with the railroad regarding responsibility for costs was controlling. *Id*. at 858. The railroad argued the Public Service Commission's delegated police power to direct reconstruction of the viaducts included the authority to apportion the costs for same. *Id*. at 859. The Supreme Court disagreed with the railroad, and held:

> [W]hen a state or city properly directs that something be done in order to protect the public health or safety, it does not necessarily or universally follow that allocation of the costs thereof is such an inseparable part of that exercise of the police power that it automatically overrides and abrogates agreements of the parties as to how expenses are to be borne.

*Id*. at 861. *State ex rel. Kansas City* held nothing more than that statutes delegating police powers to the Public Service Commission did not include, expressly or by implication, the power to impair an existing contract between regulated entities addressing the allocation of costs for ordered repairs. "It is clear that the objective sought by the [Public Service Commission] was to protect the safety of the traveling public by making the viaducts sufficiently strong and safe, not to specify who should pay therefor. The degree of that safety is not affected by the allocation of the costs between the parties." *Id*. at 862 (footnote omitted).

24

The holding in *State ex rel. Kansas City* has no application to the Agreement. Lamar's argument that City sought to preserve the ability to enforce its billboard ordinance against others by agreeing not to enforce its existing or future ordinance against Whiteco and its successors is not analogous to *State ex rel. Kansas City's* conclusion that the right to apportion costs was beyond the scope of police powers delegated to the Public Service Commission.

Lamar's further suggestion that City failed to establish that the Agreement in fact hindered its ability to exercise its police powers is also without merit. We have already explained that by exempting future applications to rebuild or relocate any of the forty-two billboards therein identified from City's billboard ordinance, the Agreement hindered City's ability to exercise its zoning police power.

Our conclusion is not dissuaded by the several cases Lamar relies on in its Brief. In *Lodge of the Ozarks, Inc.*, a lease between a city and a developer which required city to provide the developer access to sanitary sewers was held to prohibit the city from charging the developer a capacity fee for the promised access. 796 S.W.2d at 650-54. Similar to the reasoning in *State ex rel. Kansas City*, the Southern District in *Lodge of the Ozarks, Inc.* held that although the provision of sewerage is a governmental function and an exercise of police power that city could not surrender or contract away, an agreed allocation of the cost for such an improvement does not impair the city's police power, and can be enforced. *Id.* In contrast, the same lease could not be applied to prevent the city from charging a building permit fee, a regulatory fee associated with exercise of the police power of providing sewerage that could not be contracted away. *Id.* at 654-56. Both holdings

25

turned on whether the contested action was, or was not, within the scope of the city's police power. It is uncontested that at the time the Agreement was entered into, the right to regulate the height, size, location, and other attributes of outdoor advertising signs was within the scope of City's zoning police powers in light of section 71.288. *Lodge of the Ozarks, Inc.* supports the conclusion that City could not contract away the exercise of this police power.

To the same effect is *State ex rel. City of Kansas City v. The Corrigan Street Ry. Co.*, where a city was not permitted to unilaterally impose heightened obligations on a railroad beyond those contractually agreed in exchange for the right to continue to operate on city streets. 85 Mo. 263 (1884). The court recognized that had the city's contract with the railroad addressed matters within its police power, such as speed, or the number of hours of operation permitted, then the result might be different. *Id.* at 281. However, because the city had the contractual power to authorize the railroad to operate on its streets independent of its police powers, it could not, under the pretense of exercising its police powers, increase the obligations it imposed on the railroad beyond those contractually agreed. *Id.* at 280-81.

In *Farm & Home Inv. Co. v. Gannon*, the Eastern District found that a city did not improperly delegate its police power by permitting a developer to recoup the cost incurred to construct a water main by letting the developer set and retain "tap-on" fees charged to others desiring access to the main for ten years or until a certain amount of money had been recouped. 622 S.W.2d 305, 307 (Mo. App. E.D. 1981). The court observed that the city "retained control of its water system and the right under the agreement to collect its own

26

connection fees, water usage charges and the power to determine who could connect to its lines," and the developer "could not refuse to allow anyone to tap on to the water line." *Id.* (footnote omitted). As such, the city did not delegate any legislative authority. *Id.* The Agreement bears no similarity to these circumstances, as plainly the Agreement did delegate City's legislative authority to regulate billboards.

Finally, in *Kindred v. City of Smithville*, this court concluded that an agreement entered into with a private property owner granting the city an easement to install and maintain water and sewer pipes and lines across the person's property in exchange for the right to connect to those lines did not exceed the scope of the city's power. 292 S.W.3d 420, 425 (Mo. App. W.D. 2009). We held that the agreement "merely gave the [private property owner] the right to connect to the lines," a "right . . . no greater than the right granted to any citizen." *Id.* *Kindred* does not assist Lamar, and instead underscores why the Agreement is unlawful, as it exempted Whiteco and its successors from City's zoning authority, a right greater than that granted to others doing business with City, including other billboard companies.

In summary, Lamar offers no authority for the proposition that the Agreement addressed matters not necessary to the exercise of City's police powers.

Point Two is denied.[18]

---

[18]In the argument portion of its Brief addressing Point Two on appeal, Lamar also argues that the Agreement is valid because Whiteco and City "substantially complied" with section 432.070. This argument exceeds the scope of the point relied on, preserving nothing for our review. *In re Marriage of Fritz*, 243 S.W.3d 484, 488 (Mo. App. E.D. 2008) (holding that "[i]ssues that are raised only in the argument part of the brief and are not contained in the point relied on are not preserved for review"). In any event, Lamar cites no authority for the proposition that a municipality can "substantially comply" with the requirement imposed by section 432.070 that contracts not exceed the scope of the municipality's powers. Cases in Missouri which specifically address and apply the doctrine of substantial compliance to the requirements described in section 432.070 do so almost universally

27

**Point Three**

Lamar argues City is equitably estopped from denying the validity and enforceability of the Agreement, having accepted the benefits of the Agreement, and because to conclude otherwise would result in a manifest injustice.

Lamar argues that the uncontroverted facts established by the summary judgment record demonstrate that City accepted the benefit of the Agreement, performed as required by the Agreement, and that Lamar, in reliance on the Agreement, removed several signs because the "cap" provision of the Agreement necessitated that it do so before applying to "replace" the removed signs in the same or a new location. Alternatively, Lamar argues that controverted facts prevented the trial court from determining whether the doctrine of equitable estoppel applied, preventing the entry of summary judgment as a matter of law.

It is true that "[w]hether the doctrine [of equitable estoppel] applies depends upon the facts and circumstances of each particular case." *Comens v. SSM St. Charles Clinic Med. Grp., Inc.*, 258 S.W.3d 491, 496 (Mo. App. E.D. 2008). However, "[t]he application of the doctrine of equitable estoppel is 'more a question of law' than of fact, especially when . . . the essential factual issues are undisputed." *Id.* at 497 (quoting *Rodgers v. Seidlitz Paint & Varnish Co.*, 404 S.W.2d 191, 198 (Mo. 1966)).

---

with respect to the authorization and writing requirement. *See, e.g.*, *Pub. Water Supply Dist. No. 16 v. City of Buckner*, 44 S.W.3d 860, 864-65 (Mo. Ap. W.D. 2001) (holding that absence of minutes did not render agreement entered into by public water district invalid as a matter of law as compliance with section 432.070's requirements regarding municipal entity's execution of a contract can be substantial rather than complete). The statutory requirement described in section 432.070 addressing due authorization and the requirement of a writing is not at issue in this case. From a practical standpoint, a municipality either exceeds the scope of its powers, or it does not. There is no "grey area" in between permitting application of the substantial completion doctrine to this statutory requirement.

28

"The key to summary judgment is the undisputed right to judgment as a matter of law; not simply the absence [or presence] of a fact question." *ITT Commercial Fin.*, 854 S.W.2d at 380. Here, neither the uncontroverted facts Lamar relies on to support its defense of equitable estoppel, nor the alleged controverted facts Lamar alternatively argues prevented summary rejection of the defense, were material to the trial court's entry of summary judgment as a matter of law.

To secure summary judgment, City was required to establish both that there was no genuine issue in dispute to support its affirmative defense that the Agreement was void *ab initio*, **and** that there was no genuine issue in dispute to negate Lamar's affirmative avoidance of equitable estoppel. *See id.* at 381. As we explain, City sustained that burden.

It is a long settled principle in Missouri that "[c]ities cannot be made liable, either on the theory of estoppel or implied contract, by reason of the accepting and using [of] the benefits derived from void contracts." *Donovan*, 175 S.W.2d at 881 (quoting *Likes v. Rolla*, 167 S.W. 645, 647 (Mo. App. Spring. D. 1914)).

> Vain; and futile would Constitution and statutes and charter be, if any officer of the state, or of a country, or of a city or other municipality, could follow them only when he saw fit. If by estoppel such salutary provisions, enacted with wise foresight as checks upon extravagance and dishonesty, can be utterly abrogated at will by any officer, such provisions then subserve no purpose, and the public corporation has no earthly protection against either greed or graft. . . . Equitable estoppel is impotent to purge transactions of the fatal infirmity of being in violation of law.

*Id.* (citations omitted); *see also Stewart*, 165 S.W.2d at 629 ("[T]he doctrine of estoppel cannot be applied to a municipality where it has no power under any circumstance to make the contract in question."); *Sager v. State Highway Comm'n*, 160 S.W.2d 757, 763 (Mo.

29

1942) (holding that "the State (even though receiving a benefit from performance) cannot by estoppel become bound by the unauthorized contracts of its officers") (quotation omitted); *Fleshner v. Kansas City*, 156 S.W.2d 706, 707 (Mo. 1941) (holding that where a city enters contract in excess of its statutory power, "the mere fact that the municipality has received the benefits of the contract which has been performed by the other party, does not make the municipality liable, either on the theory of ratification, estoppel, or implied contract, in order to do justice to the other party by paying the reasonable value of the property or services"); *St. Charles Cty.*, 184 S.W.3d at 167 (holding that "[t]he fact that a municipality has received the benefit of a performance by the other party does not make the municipality liable either on the theory of ratification, estoppel or implied contract") (citing *Gill Constr. Inc.*, 157 S.W.3d at 708).

Thus, "[t]he public and those dealing with municipalities and their officers are charged with notice of their corporate powers and the authority of their officers and must govern themselves accordingly." *Donovan*, 175 S.W.2d at 881. Though Lamar complains that it would constitute a manifest injustice to leave it without a remedy here, as it has removed, to its significant financial detriment, several billboards anticipating applications for replacement billboards would be approved, Lamar's "difficulty lies in the legal policy— a policy which makes the [Agreement] void and precludes a remedy."[19] *Id.* at 884.

---

[19]During oral argument before the trial court on the parties' competing motions for summary judgment, counsel for Lamar (who had also served as counsel for Whiteco in negotiating the Agreement) conceded that he told his client at the time that "there was a possibility that the next people down the line would try to somehow get out of this contract." [Transcript, p. 43]

30

Lamar disagrees, and argues that the doctrine of equitable estoppel applies to municipalities. Generally speaking, that is a true statement. *See Town of Montevallo v. Village Sch. Dist.*, 186 S.W. 1078, 1079-80 (Mo. banc 1916). This general principle is consistent with the fact that "contracts made by [a] city, ***if authorized***, are just like other contracts. They are measured by the same tests and subject to the same rights and liabilities." *State ex rel. Kansas City Ins. Agents' Ass'n v. Kansas City*, 4 S.W.2d 427, 431 (Mo. banc 1928) (emphasis added). However, "as to municipalities [the doctrine of equitable estoppel] is applied cautiously because of the public interest involved." *Fleshner*, 156 S.W.2d at 707. More to the point, as the emphasized language above foretells, the general rule that municipalities may be subject to the doctrine of equitable estoppel bows to the statutory requirements to form an authorized contract described in section 432.070, and to the legal policy that void municipal contracts cannot be enforced or remediated, on *any* theory, including equitable estoppel. "[E]quitable estoppel is not applicable if it will interfere with the proper discharge of governmental duties, curtail the exercise of the state's police power or thwart public policy." *State ex rel. Capital City Water Co. v. Missouri Pub. Serv. Comm'n*, 850 S.W.2d 903, 910 (Mo. App. W.D. 1983) (citing *Applicability of Doctrine of Estoppel Against Government and its Governmental Agencies*, 1 A.L.R.2d 338, 341 (1948)).

Undeterred, Lamar argues that a few Missouri cases have held that void municipal contracts can be enforced based on the doctrine of equitable estoppel in "exceptional circumstances." Lamar cites *State ex rel. City of Sikeston v. Missouri Utils. Co.*, 53 S.W.2d 394, 399-400 (Mo. banc 1932) for this proposition. Indeed, in *State ex rel. City of Sikeston*,

31

the Missouri Supreme Court held that "[w]hile the doctrine of equitable estoppel is not generally applicable to municipal corporations in matters pertaining to governmental functions, yet courts, with much caution, may apply the doctrine in exceptional cases where upon all the circumstances of the case right and justice require it." *Id*. at 400. Lamar neglects to mention, however, that *State ex. rel City of Sikeston* did not involve an effort to enforce a municipal contract, let alone a contract that was void at its inception. Rather, the case involved the grant of a certificate of convenience and necessity by the Public Service Commission to a utility to install transmission poles and wires to furnish electric light and power within the city limits of a city without having secured the required consent of the city. *Id*. at 398-99. After sitting idly by for years, assessing taxes against the utility, accepting the benefit of provided electric services, and aware that the utility had relied on the efficacy of its certificate of convenience and necessity, the City of Sikeston sought to oust the utility. *Id*. at 400. The Supreme Court found that the City of Sikeston was estopped to deny the rights of the utility. *Id*. *State ex rel. City of Sikeston* stands only for the general proposition that the doctrine of equitable estoppel can be applied against municipalities in exceptional circumstances. The case did not address whether the doctrine of equitable estoppel can be applied to enforce municipal contracts that are void at their inception because they fail to comply with section 432.070.

Similarly, Lamar's reliance on *State ex rel. Casey's General Stores, Inc. v. City of Louisiana*, 734 S.W.2d 890 (Mo. App. E.D. 1987) and *State ex rel. City of Monett v. Lawrence Cty.*, 407 S.W.3d 635 (Mo. App. S.D. 2013) is misplaced. In *State ex rel. Casey's General Stores*, a developer acquired land that was not subject to zoning for the purpose

32

of building a convenience store. *Id*. at 893. The city thereafter attempted to enact a zoning ordinance that rendered the developer's intended use unlawful, and refused to issue the developer a building permit. *Id*. The developer filed suit, and successfully argued that its use of the land was a pre-existing nonconforming use, and that the city should be estopped from denying the developer a building permit, particularly as the zoning ordinance the city was relying on to deny the developer a building permit had not been validly adopted. *Id*. at 895-96. *State ex rel. Casey's General Stores* did not address reliance on the doctrine of equitable estoppel to enforce a municipal contract at all, let alone a contract that was void *ab initio*.

In *State ex rel. City of Monett*, a city sought to enforce tax increment financing (TIF) allocations, and a county argued that the TIF districts were not validly formed. 407 S.W.3d at 637. The Southern District recognized that "estoppel and laches rarely lie against government bodies," but that "[e]stoppel has been 'held to apply . . . where . . . the controversy is between one class of the public as against another class.'" *Id*. at 639-40 (quoting *State ex rel. Consol. Sch. Dist. No. 2 v. Haid*, 41 S.W.2d 806, 808 (Mo. 1931)). As in *State ex rel. Casey's General Stores*, however, *State ex rel. City of Monett* did not involve a municipal contract at all, let alone one that was void *ab initio* for want of compliance with section 432.070.

Admittedly, Lamar's contention that the "exceptional circumstances" exception extends to void municipal contracts is seemingly aided by Lamar's reliance on *Muncy v. City of O'Fallon*, 145 S.W.3d 870 (Mo. App. E.D. 2004). In *Muncy*, the Eastern District noted that "unless exceptional circumstances exist, equitable remedies such as estoppel

33

cannot be implemented to overcome the requirements of section 432.070." *Id.* at 873 (citing *Watson v. City of St. Louis*, 956 S.W.2d 920, 922 (Mo. App. E.D. 1997) (also stating that "[u]nless exceptional circumstances exist, equitable remedies such as promissory estoppel cannot be employed to overcome the requirements of section 432.070")).

*Muncy* and *Watson* cannot be reconciled, however, with absolute and contrary Missouri Supreme Court decisions which hold that "[c]ities cannot be made liable, either on the theory of estoppel or implied contract, by reason of the accepting and using [of] the benefits derived from void contracts." *Donovan*, 175 S.W.2d at 881 (quotation omitted); *see also Stewart*, 165 S.W.2d at 629; *Sager*, 160 S.W.2d at 763-64; *Fleshner*, 156 S.W.2d at 707. A cursory review of *Muncy* and *Watson* demonstrate why both cases are in error, and cannot be followed for the proposition cited by Lamar.

*Muncy* relied on *Watson* for the proposition that unless exceptional circumstances exist, equitable remedies such as estoppel cannot be employed to overcome the requirements of section 432.070. *Muncy*, 145 S.W.3d at 873 (citing *Watson*, 956 S.W.2d at 922). It did so without analysis. For this same proposition, *Watson* cited to *Kennedy v. City of St. Louis*, 749 S.W.2d 427 (Mo. App. E.D. 1988) and *Murrell v. Wolff*, 408 S.W.2d 842 (Mo. 1966). *Watson*, 956 S.W.2d at 922. *Watson*'s reliance on *Kennedy* and *Murrell* reflects an incomplete and inaccurate reading of both cases.

In *Kennedy*, the Eastern District, citing to *Murrell*, observed ***generally*** that "[w]hile the doctrine of 'equitable estoppel' ordinarily is not applicable against governmental entities, courts may apply the doctrine in 'exceptional cases' where required by 'right and justice.'" *Kennedy*, 749 S.W.2d at 433 (quoting *Murrell*, 408 S.W.2d at 851). *Kennedy*

34

continued, however, to exclude from this general rule void municipal contracts, observing that "***[b]ut where statutory and charter provisions relating to municipal contracts are not complied with, the doctrine is not applicable and the municipality is not estopped.***" *Id.* at 433-34 (emphasis added). *Kennedy* noted that "[n]one of the authorities relied upon by the appellants [to urge equitable estoppel] stand for the proposition that estoppel may be asserted so as to hold the municipally responsible on the basis of [a] contract in violation of section 432.070." *Id.* at 434. In explaining this point, *Kennedy* discussed *Murrell* and explained that although *Murrell* held that exceptional circumstances would permit application of the doctrine of equitable estoppel against a municipality, the case involved a franchise to use a public street, and not a municipal contract, let alone a void municipal contract. *Id.* (citing *Murrell*, 408 S.W.2d 842). In short, *Kennedy* stands for the exact opposite proposition from that for which it was cited by *Watson*. And *Muncy*'s citation to *Watson* served to perpetuate the error.

In short, there is no reasoned authority for the proposition that the doctrine of equitable estoppel can be employed to enforce a municipal contract that is void *ab initio* pursuant to section 432.070, even in the face of "exceptional circumstances." Though *Muncy* and *Watson* mistakenly stated to the contrary, they did so in error, and should not be cited for this proposition.[20] Rather, as our Supreme Court has cogently observed:

> It is true . . . that the doctrine of estoppel applies to municipalities as well as to natural persons and private corporations when necessary to prevent a

---

[20]In accordance with Supreme Court Operating Rule 22.01, and Western District Special Rule XXXI, our decision not to follow the previous decisions of the Eastern District Court of Appeals in *Muncy v. City of O'Fallon*, 145 S.W.3d 870 (Mo. App. E.D. 2004) and *Watson v. City of St. Louis*, 956 S.W.2d 920 (Mo. App. E.D. 1997) has been reviewed en banc. An order stating that this opinion has been reviewed and approved by order of the court en banc has been signed by the chief judge and placed in the case file.

35

manifest injustice. But as to municipalities it is applied cautiously because of the public interest involved. ***Nevertheless, it is a well-recognized rule that the doctrine of estoppel is not applied in cases . . . where the city had no power under any circumstances to make the . . . contract in question***.

*Fleshner*, 156 S.W.2d at 707 (emphasis added) (citation omitted). This rule of law, "established for the public good, doubtless impose[s] a severe hardship on [Lamar]. However, one may not deal with those representing municipal governments without taking notice of the limitations of their powers and authority." *Id.*

In summary, the trial court did not err in concluding that as a matter of law, the Agreement could not be enforced against the City, or otherwise remediated, pursuant to the doctrine of equitable estoppel because the Agreement was void *ab initio* as it exceeded the scope of City's powers pursuant to section 432.070.

Point Three on appeal is denied.

**Point Four**

Finally, Lamar argues that controverted facts and an absence of material uncontroverted facts demonstrate that there is no support in the record to establish that the Agreement hinders public health, welfare or safety, or for the Judgment's conclusion that a "significant variance" existed between City's billboard ordinance and the billboards for which application was made by Lamar.

Lamar first argues that it is controverted whether City's police power was hindered by the Agreement, because City presented no facts to demonstrate that the public health, welfare, or safety was hindered by the Agreement. Lamar also argues that it is uncontroverted that City never formally determined that the Agreement is adverse to its

36

interests.   Lamar cites no authority establishing that either "fact" was material to determining whether City exceeded the scope of its powers by surrendering and contracting away zoning authority that would otherwise have applied to Lamar's efforts to rebuild or relocate eight of the forty-two signs identified in the Agreement.  For reasons we explain, neither factual contention prevented the entry of summary judgment in favor of City as a matter of law.

We have already explained that the Agreement hindered City's zoning authority, and that zoning authority is an exercise of police powers.  City thus established all that was necessary to demonstrate that the Agreement exceeded the scope of City's powers in violation of section 432.070.  *Stewart*, 165 S.W.2d at 629 (holding that if a contract surrenders or contracts away governmental functions, then it exceeds the scope of a governmental entity's powers, and is void).

It is true that "[t]he due process clauses of both the Fourteenth Amendment to the U.S. Constitution and Article 1, Section 10 of the Missouri Constitution, require zoning to bear a substantial relationship to health, safety, morals or the public welfare." *White v. City of Brentwood*, 799 S.W.2d 890, 892 (Mo. App. E.D. 1990) (citing *Flora Realty & Inv. Co. v. City of Ladue*, 246 S.W.2d 771, 778 (Mo. banc 1952) (other citation omitted)).  However, "[z]oning ordinances are presumed to be valid. . . . [T]he challenger bears the burden of proving an ordinance's unreasonableness as applied to his property." *Id*. (quoting *Elam v. City of St. Ann*, 784 S.W.2d 330, 335 (Mo. App. E.D. 1990)).  Because City's billboard ordinance hindered by the Agreement is presumed to be valid, City had no obligation to present facts establishing that its billboard ordinance is reasonable because it impacts

health, safety, morals or the public welfare. Rather, it would have been Lamar's burden to prove that the Agreement did not hinder City's lawful police power because City's billboard ordinance is unconstitutionally unreasonable because it does not further public welfare, health, or safety. Lamar's pleadings (including its summary judgment pleadings) did not challenge the constitutionality of City's billboard ordinance on this or any other basis.

Lamar's further contention that City never formally declared the Agreement to be adverse to its interests and never officially repudiated the Agreement preserves nothing for our review. Lamar does not explain the legal relevance of this fact, and provides no authority explaining why the fact prevented the trial court from determining that the Agreement was void *ab initio* pursuant to section 432.070 because it exceeded the scope of City's powers. *Ad Trend*, 272 S.W.3d at 206-07 (holding that pejorative allegations about questioned actions where the legal significance is not explained nor supported by relevant authority or by an explanation for the lack of relevant authority are deemed abandoned and unpreserved for appellate review).

Lamar's fourth point on appeal next argues that "[a] key finding and conclusion by the Trial Court was that Lamar's eight permit applications 'showed significant variance between the ordinances and billboards as proposed.'" [Appellant's Brief, p. 44] Lamar contends that this "key finding" was not established by the summary judgment record. Lamar contends that all that is uncontroverted is:

> that Lamar submitted eight sign permit applications, and that the City denied the applications by declaring that the applications did not conform to City Code. There was no competent evidence before the Trial Court that Lamar's eight applications in fact sought outdoor advertising signs that did not comply, or that the signs "significantly" varied from the applicable Code.

38

[Appellant's Brief, p. 44] Lamar's quarrel with the Judgment's factual finding has no bearing on whether the Agreement was void *ab initio*, the legal basis for the trial court's entry of summary judgment.

City's motion for summary judgment did not seek judgment in its favor because Lamar's permit applications failed to comply with City's billboard ordinance. Instead, because the Petition relied exclusively on the Agreement (not City's billboard ordinance) as the basis for urging issuance of the applied-for permits, City's motion for summary judgment relied exclusively on the legal contention that the Agreement was void *ab initio*. Correspondingly, the trial court did not enter summary judgment in favor of City because Lamar's permit applications failed to comply with City's billboard ordinance. Rather, the trial court entered summary judgment in favor of City because the Agreement Lamar's Petition relied on to urge issuance of the applied for permits was void *ab initio*.

Thus, it is immaterial whether the trial court's finding that a "significant variance" existed between City's ordinance and the eight billboards Lamar proposed was supported by the uncontroverted summary judgment record. The finding was not "a key finding and conclusion" essential to the Judgment. The trial court did not need to address or determine whether there was a variance between Lamar's applications and City's billboard ordinance in order to conclude that the Agreement was void *ab initio* because it violated section 432.070.[21]

---

[21]Lamar's current suggestion to the contrary is perplexing. It is difficult to conceive why Lamar's Petition would mount an attack on City's denial of its permit applications based solely on the validity and enforceability of the Agreement if, as Lamar's argument on appeal seems to imply, Lamar's applications complied with City's billboard ordinance and should have been approved independent of the terms of the Agreement.

39

Point Four on appeal is denied.

## Conclusion

The trial court's Judgment granting summary judgment in favor of City and the individual defendants as to all claims asserted in Lamar's Petition is affirmed.

_____
Cynthia L. Martin, Judge


All concur