#28903, #28923-a-PJD
**2020 S.D. 30**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

LAMAR ADVERTISING OF SOUTH
DAKOTA, L.L.C., a South Dakota
Limited Liability Company,                          Plaintiff and Appellant,

        v.

CITY OF RAPID CITY, a South
Dakota Municipal Corporation, and
EPIC OUTDOOR ADVERTISING,
a South Dakota Corporation,                         Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE CRAIG A. PFEIFLE
Judge

\* \* \* \*

EDWARD C. CARPENTER of
Costello, Porter, Hill, Heisterkamp,
    Bushnell & Carpenter, LLP
Rapid City, South Dakota                            Attorneys for plaintiff and
                                                    appellant.

\* \* \* \*

                                                    CONSIDERED ON BRIEFS
                                                    NOVEMBER 4, 2019
                                                    OPINION FILED **06/03/20**

JOEL P. LANDEEN
CARLA R. CUSHMAN of
City of Rapid City
Rapid City, South Dakota

Attorneys for defendant and
appellee City of Rapid City.


MICHAEL K. SABERS of
Clayborne, Loos & Sabers, LLP
Rapid City, South Dakota

Attorneys for defendant and
appellee Epic Outdoor
Advertising.

#28903, #28923

DEVANEY, Justice

[¶1.]     In this appeal, Lamar Advertising contends that the circuit court erred in failing to declare that the City of Rapid City unlawfully bargained away its police power when it entered into a settlement agreement with Epic Outdoor Advertising under which the City agreed to amend certain sign code ordinances and grant Epic two sign permits. By notice of review, Epic asserts the circuit court erred in denying Epic's request that the court declare invalid a similar settlement agreement previously executed between Lamar and the City. We affirm.

**Factual and Procedural Background**

[¶2.]     In 2015, Epic petitioned the circuit court for a writ of certiorari, challenging the Rapid City Board of Adjustment's (the Board) decision to prohibit Epic's use of four video signs. The signs were constructed prior to the City's ban on video signs, and the City applied its ban retroactively against Epic's signs. The circuit court granted Epic's petition and reversed and remanded the Board's decision. Both the City and Epic appealed the circuit court's decision to this Court. While the appeal was pending, however, the parties negotiated a proposed settlement agreement "to memorialize the terms of a settlement reached between the parties for the complete and final disposition of their claims, differences, and causes of action arising out of" the above lawsuit. The agreement specifically provided that it did not resolve any claim related to a separate lawsuit pending between Epic and the City.

[¶3.]     On March 23, 2018, the City posted a summary of the proposed settlement agreement as an agenda item for its March 28, 2018 legal and finance

-1-

committee meeting. The summary explained the reason for the agreement and identified the proposed terms. The "Recommendations" section related the following: "Action: Approve or Deny[;] Notes: Since the parties have briefs they will need to file time is of the essence. Epic needs an up or down vote." The summary explained the following options: "If you approve the settlement agreement staff will begin working on the ordinance amendments necessary to fulfill the City's commitments. Once the ordinance amendments are approved and become effective, the lawsuits will be dismissed. If you reject the parties will continue the appeal on this case to a final resolution."

[¶4.] The settlement agreement was listed as an agenda item at the City Council's April 2, 2018 meeting. The agreement had been revised prior to the City Council meeting, and at the meeting, the City attorney explained the revision. Also during the meeting, counsel for Epic related a history of the lawsuit and the rationale behind the settlement agreement. Multiple citizens opposed the agreement. Of those opposing, one citizen expressed the need for the City "to change the way the industry is allowed to operate" and another specifically asked that the Council not sign the agreement.

[¶5.] A motion was made to deny the agreement, and during a discussion on the motion, a council member expressed concern over approving an agreement without knowing the proposed changes to the ordinance. This council member specifically opposed the agreement, believing it would essentially tie the Council's hands. Counsel for the City remarked that "it would be a breach of the agreement if council didn't sign the future ordinance."

[¶6.] After additional concerns were shared, a substitute motion was made to approve the settlement agreement. A council member, although supporting the motion to approve, noted frustration regarding efforts made to eliminate the presence of billboards. He explained that the City "gets sued" and "lose[s]" and the City "keep[s] spending the taxpayer's dollars over and over to lose again." Epic's counsel answered questions regarding the settlement agreement, and after considering additional comments from council members, the council voted 7 to 3 to approve the agreement.

[¶7.] The settlement agreement provides in relevant part:

1. Within ninety (90) days of this Agreement being approved by the City, the City agrees to amend its ordinances to increase the maximum size of off-premises signs (billboards) along Interstate 90 within the City to Six Hundred and Seventy-two (672) square feet. The City also agrees as part of this ordinance amendment to increase the maximum sign pole height for off-premises signs along Interstate 90 from thirty (30) feet to forty (40) feet as measured from the base of the pole to the top of the pole. The City can accomplish these changes through the creation of a zoning overlay district along the Interstate.

2. Within ninety (90) days of this Agreement being approved by the City, the City agrees to amend its ordinances to remove any requirement to obtain a conditional use permit for any work to an existing off-premises sign. The City will continue to require that a conditional use permit be obtained for any new off-premises signs.
        . . . .

5. That Epic and the City agree that it has been and is important to the City that there is not a proliferation of billboards. With that understanding, Epic has already obtained a conditional use permit on a location commonly referred to as Dyess Avenue where it can currently construct a digital billboard in a size commonly known as poster size. This settlement would allow Epic to construct the digital billboard but in the size allowed in the interstate district as provided herein. The City of Rapid City agrees that this larger board will

be permitted as provided for in Exhibit 1 and that will be granted contemporaneous with this agreement being signed. The parties agree that the issuance of the Dyess Avenue Board will require the use of two sign credits. The second board discussed is the Deadwood Avenue billboard which is an older existing billboard controlled by the same owner as my client [Epic]. The City agrees that by ratifying this agreement it would also be approving the permit for the Deadwood Avenue sign under the interstate district contemplated herein and attached as Exhibit 2. The ratification of this agreement results in no billboards that are already approved or otherwise in existence. The parties agree that the issuance of the Deadwood Avenue Board would also require the use of two sign credits as required under the existing ordinance.

. . . .

7. If this Agreement is ratified, the parties will jointly file a motion to the South Dakota Supreme Court seeking to continue the filing dates for the current appeal or otherwise hold this matter in abeyance pending the City fulfilling its obligations under this Agreement. Within ten (10) days after the ordinances identified in sub-sections (1) and (2) have been approved and the period in which they can be referred has past, the parties authorize their attorneys to execute a Stipulation for the Court to enter a Judgment of Dismissal of the claims they each have made against the other in the pending lawsuit identified in Section One of this Agreement.

. . . .

The terms of this agreement are non-severable and, unless otherwise agreed to by the parties, this Agreement shall terminate if any term or provision of this Agreement fails or is held by a court of competent jurisdiction or other competent authority to be invalid, void, or otherwise unenforceable.

On April 3, 2018, following approval of the settlement agreement, Epic and the City filed a joint application under SDCL 15-26A-76 to stay the appeal pending before this Court. We granted the stay, and a subsequent application for a similar stay.

[¶8.] In May 2018, prior to any amendments being made to the ordinances, Lamar filed a declaratory judgment action against the City and Epic, requesting that the circuit court declare the settlement agreement invalid. According to

-4-

Lamar, the City bargained away its zoning authority by agreeing to rezone in advance of the required notice and hearing and by agreeing to issue sign permits to Epic in violation of the existing sign code. Lamar requested that the circuit court find "that any actions taken pursuant to the [agreement] are void ab initio and of no legal force[.]"

[¶9.] Epic and the City filed separate answers. The City denied that it had bargained away its zoning authority, indicating that any amendments to the ordinances "will go through the required legal process where they may be approved or rejected by the City Council." The City further claimed that the settlement agreement is conditional. Alternatively, the City asserted the affirmative defenses of waiver and estoppel. It claimed that because Lamar and the City entered into a similar settlement agreement in 2016, Lamar should be barred from claiming that the settlement agreement between Epic and the City is void.

[¶10.] Epic likewise asserted that the settlement agreement is valid and that Lamar should be estopped from asserting that Epic's agreement is invalid because Lamar waived that claim by entering into its similar agreement with the City. Alternatively, Epic requested that in the event Lamar "is successful in its legal allegations claiming the Epic Agreement is somehow invalid," the court should also declare the settlement agreement between Lamar and the City invalid. Epic further asserted a counterclaim against Lamar for tortious interference with contractual relations.

[¶11.] Lamar filed a motion for summary judgment on its request for declaratory relief and Epic's counterclaim for tortious interference with contractual

relations. The City and Epic opposed Lamar's motion but did not file cross-motions for summary judgment requesting that the court declare Epic's agreement valid. However, Epic filed a motion for summary judgment on its request that the court declare the 2016 agreement between Lamar and the City invalid.

[¶12.] While the parties litigated Lamar's suit, the City drafted amendments to the sign code pursuant to the settlement agreement with Epic. On June 15, 2018, an assistant city attorney issued a memo to the Planning Commission, explaining that the "amendments are being submitted to the Planning Commission for its recommendation, and ultimately to the Council for its approval, pursuant to a settlement agreement entered into between the City and Epic Outdoor Advertising." In regard to increasing the maximum size and height of off-premises signs along Interstate 90, the memo related that conversations had occurred at the City for several years concerning the correlation between the size and height of a sign and the speed limit on the adjacent roadway. The memo identified that "the higher visual impact is justified by the higher speeds of travelers along the Interstate." In regard to the amendment to the conditional use provision, the memo related that the amendment would apply only to existing signs and would merely remove the requirement to get new conditional use approval (after already having obtained approval) every time work is done to an existing sign.

[¶13.] The Planning Commission held a meeting on June 21, 2018. During the meeting, an assistant city attorney explained the reason for the amendments. One commission member expressed disagreement with the proposed changes and made a motion to deny the amendment. During a discussion on the motion, the

assistant city attorney confirmed that if approved, the Council could revise the amended ordinance "as it goes forward if that is what they decide." The motion to deny failed, and a subsequent motion to approve was passed by a vote of 7 to 2.

[¶14.]        Thereafter, at a June 27, 2018 meeting of the legal and finance committee, one committee member expressed that she was not opposed to "taking a look at a district along the Interstate," although she was opposed to the settlement agreement. She indicated that she would vote against this amendment because it was drafted pursuant to the terms of the agreement. An assistant city attorney replied, "[W]e cannot change our ordinances through an agreement[.]  [I]t has to go through the readings and the processes required by State law.  This ordinance will go through two readings like any other ordinance[;] you can choose to make changes or choose not to make changes." A motion to approve the amendment ultimately passed by a vote of 3 to 1.

[¶15.]        Finally, the proposed amendment to the sign code ordinances was considered at a July 2, 2018 Council meeting. During a discussion on a motion to approve the amendment, several council members expressed disapproval. Nonetheless, the motion passed by a vote of 8 to 2, and the proposed amendment was set for a second reading in two weeks. The amendment was read a second time on July 11, 2018 before the legal and finance committee and passed with a 3-to-1 vote. It similarly passed after a second reading before the Council on July 16, 2018, and became effective twenty days after its publication. *See* SDCL 9-19-13 (providing that an ordinance becomes effective "on the twentieth day after its publication unless suspended by operation of a referendum").

[¶16.]     On September 18, 2018, the circuit court held a hearing on the parties' motions for summary judgment. During the hearing, Lamar acknowledged that the ordinances were amended after the required notices were given and hearings held. It nonetheless argued that such process was pro forma because the City had already formally bound itself to amend the ordinances by entering into the settlement agreement. Lamar alleged that the City engaged in unlawful contract zoning; thus the amended ordinances were invalid and the sign permits issued to Epic were unlawful. In response, Epic and the City argued that the settlement agreement was conditional and that the City validly exercised its police power in amending the ordinances and issuing the permits. The circuit court directed the parties to submit supplemental briefing on the issue of the sign permits.

[¶17.]     After a second hearing before a different judge, the circuit court issued an order denying Lamar's motion for summary judgment on its request for declaratory relief. Noting that the facts were undisputed, the court concluded that the City did not bargain away its zoning powers. According to the court, "the discussion and divided votes at the Planning Commission and City Council meetings demonstrate a meaningful legislative process that merits a presumption of validity." The court further concluded that "[t]he continuation of the legal suit confirms that the parties conditioned their settlement [on] the City's exercise of its police power to regulate signs," and thus the settlement agreement was not "a strict contract granting vested rights." In regard to the sign permits, the court determined that Lamar "failed to appeal the permit as specified in RCMC § 17.54.010(B)(3)(a)," and did not present "an extraordinary factual situation that

-8-

would render the situation proper for judicial review." Finally, the court denied

Epic's motion for summary judgment requesting that the court declare Lamar's

agreement with the City void, and granted Lamar's motion for summary judgment

on Epic's counterclaim for tortious interference with contractual relations.

[¶18.]    Lamar appeals, asserting that: (1) the City unlawfully contracted away

its police powers by agreeing to amend its zoning ordinances by settlement

agreement; and (2) Lamar was not required to exhaust its administrative remedies

before challenging sign permits purportedly guaranteed to Epic in the settlement

agreement.  By notice of review, Epic argues the circuit court erred when it denied

summary judgment on Epic's request that the court declare the agreement between

Lamar and the City void.[1]

---

1.    Epic suggests that this Court does not have jurisdiction to consider Lamar's
      appeal because Lamar did not have the circuit court's order certified under
      SDCL 15-6-54(b) and Lamar did not timely petition for discretionary appeal
      under SDCL 15-26A-13.  Under SDCL 15-26A-3(1), an appeal may be taken
      from "[a] judgment" of the circuit court.  We have "interpreted the term
      'judgment' to refer to a judgment which is final rather than interlocutory."
      *Smith v. Tobin*, 311 N.W.2d 209, 210 (S.D. 1981).  "[T]he substance of the
      decision[,] rather than its form or name[,]" determines finality.  *O'Neill v.
      O'Neill*, 2016 S.D. 15, ¶ 31, 876 N.W.2d 486, 498 (quoting *Griffin v. Dwyer*, 88
      S.D. 357, 359, 220 N.W.2d 1, 2 (1974)).  Therefore, the controlling inquiry is
      whether the order "finally and completely adjudicate[d] all of the issues of
      fact and law presented by the parties for litigation."  *Smith*, 311 N.W.2d at
      210.  Here, the circuit court's order determined with finality the issues
      between the parties, and this Court has appellate jurisdiction.  The court
      ruled as a matter of law that the settlement agreement between Epic and the
      City is valid.  The court's order further forecloses Lamar's ability to proceed
      on its challenge to the sign permits issued to Epic because of Lamar's failure
      to exhaust its administrative remedies.  Finally, Epic's claim alleging the
      invalidity of the agreement between Lamar and the City was an alternative
      claim that the circuit court need not have reached given its determination
      that the City had not unlawfully contracted away its police power in its
      settlement agreement with Epic.  In any event, in denying Epic's motion for

                                                          (continued . . .)

## Standard of Review

[¶19.] We review a grant or denial of summary judgment de novo. *Abata v. Pennington Cty. Bd. of Comm'rs*, 2019 S.D. 39, ¶ 8, 931 N.W.2d 714, 718. "Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper." *Millard v. City of Sioux Falls*, 1999 S.D. 18, ¶ 8, 589 N.W.2d 217, 218 (quoting *Walther v. KPKA Meadowlands Ltd. P'ship*, 1998 S.D. 78, ¶ 14, 581 N.W.2d 527, 531).

## Analysis and Decision

### 1. Whether the City contracted away its police powers by agreeing to amend the sign code.

[¶20.] Lamar acknowledges that the City has the power and authority to enter into settlement agreements to resolve litigation concerning land use disputes. *See, e.g., Hauck v. Bull*, 79 S.D. 242, 110 N.W.2d 506, 509 (1961); *accord State v. Davis*, 11 S.D. 111, 75 N.W. 897 (1898). However, Lamar contends that the "City's power to settle claims does not allow it to disregard the limitations on its powers" and enter into a private agreement dictating the terms of a public ordinance "under the guise of compromise[.]"

[¶21.] In *Ericksen v. City of Sioux Falls*, we examined the validity of a contract between the Sioux Falls and Morrell & Company wherein the City gave Morrell the right to empty its sewage into the City's system for 15 years. 70 S.D.

_____

(. . . continued)
summary judgment, the court effectively issued a decision against Epic on the merits of this claim.

40, 14 N.W.2d 89 (1944). In declaring the contract invalid, the Court explained that "[i]t is not within the power of a city to guarantee that it will successfully operate a sewage disposal plant or an adequate system." *Id.* at 53, 14 N.W.2d at 95. The regulation of the City's sewers is a police function; therefore, the City must at all times retain the power to regulate its sewers "and any attempt by way of contract to deprive the city of that control is void." *Id.* at 54, 14 N.W.2d at 95.

[¶22.]     Similarly, Rapid City's regulation of signage is a police function and the City may not, by way of contract, surrender its police powers. However, unlike the contract in *Ericksen*, Rapid City's settlement with Epic in no way prevents future councils from regulating signage in the City or from further amending the sign code in a manner contrary to the amendments set forth in the settlement agreement. Moreover, unlike the agreement in *Ericksen*, which conferred a special benefit to Morrell over and above what other citizens would be entitled to, Rapid City's amendment to the sign code conferred no special benefit to Epic; rather, the benefit of the amendments would be available to all sign companies.[2]

[¶23.]     Lamar asserts that it is immaterial that the settlement agreement confers no special benefit to Epic and does not bind future councils. Rather, according to Lamar, by entering into the settlement agreement with Epic, the City violated the fundamental rule applied in *Ericksen*—that the City's police power

---

2.     Lamar further asserts that because the settlement agreement included provisions that were not related to the dispute in the underlying lawsuit between Epic and the City, the settlement was an improper "device" which allowed Epic, a private party, "to wheedle massive changes in unrelated City ordinances." Because Lamar has not cited controlling or persuasive authority to support this claim, it does not merit further examination.

"cannot be bargained away by contract[.]" *See id.* at 54, 14 N.W.2d at 95. Lamar argues that the City engaged in unlawful "contract zoning" by making specific promises to amend the sign code in a specified manner *before* notice and hearing procedures occurred. Lamar further suggests that even though the City ultimately observed the notice and hearing procedures before amending the ordinances, this fact is irrelevant because at that point any proceedings held upon the matter were merely pro forma.

[¶24.] In response, the City contends that the language of the agreement itself supports that it was conditioned on the City's exercise of its police power to regulate signs. The City further emphasizes that the settlement agreement conferred no special rights to Epic beyond those available to other citizens in Rapid City. On this point, the City highlights that it did not agree to rezone specific property, but rather agreed to pursue an amendment of generally applicable zoning regulations. Finally, the City contends its exercise of its police powers was not pro forma, noting specifically that it adhered to public notice and hearing requirements, and at these hearings, citizens offered public comment in opposition and the vote of the Council was divided.

[¶25.] Epic advances arguments similar to those asserted by the City. However, Epic also contends that great deference should be afforded to the City's decision to negotiate and settle a lawsuit to negate the risk of expending additional taxpayer funds that would otherwise be incurred in ongoing litigation. Epic further contends that because "[t]he appropriate process was followed, and it was a disputed process with close votes at the Planning Commission, and split votes at

both readings before Council[,]" Lamar has failed to establish that the City acted arbitrarily and unreasonably.

[¶26.]     This Court has not before examined the concept of "contract zoning." However, other courts have consistently defined contract zoning as "an agreement between a municipality and another party in which the municipality's consideration consists of either a promise to zone property in a requested manner or the actual act of zoning the property in that manner." *Dacy v. Village of Ruidoso*, 845 P.2d 793, 796 (N.M. 1992); *accord McLean Hosp. Corp. v. Town of Belmont*, 778 N.E.2d 1016, 1020 (Mass. App. Ct. 2002); *Old Canton Hills Homeowners Ass'n v. City of Jackson*, 749 So. 2d 54, 57 (Miss. 1999); *Citizens for Safety & Clean Air v. City of Clinton*, 434 S.W.3d 122, 128 (Tenn. Ct. App. 2013). Contract zoning has been criticized because the situation ordinarily involves a municipality using its zoning power as a bargaining chip, which limits the municipality's right and duty to act on behalf of the public. *Citizens for Safety*, 434 S.W.3d at 129; *Old Canton*, 749 So. 2d at 58; *Warner Co. v. Sutton*, 644 A.2d 656, 659–60 (N.J. Super. Ct. App. Div. 1994). Such contracts, therefore, conflict with the well-settled premise that a municipality's zoning police power, like any other police power, "may not be surrendered or curtailed by bargain or its exercise controlled by the considerations which enter into the law of contracts." *V.F. Zahodiakin Eng'g Corp. v. City of Summit*, 86 A.2d 127, 131 (N.J. 1952).

[¶27.]     To assure that zoning remains an exercise of police power to serve the public good, some courts have declared contract zoning invalid per se regardless of the attendant circumstances. *Chung v. Sarasota Cty.*, 686 So. 2d 1358, 1360 (Fla.

Dist. Ct. App. 1996) (holding that the obligation to follow requirements for public hearings must occur before the decision to rezone occurs); *accord Hartman v. Buckson*, 467 A.2d 694, 699 (Del. Ch. 1983); *Zupancic v. Schimenz*, 174 N.W.2d 533, 537 (Wis. 1970). To these courts, any private agreement to zone property in a specific way is invalid because the ultimate zoning decision is based on an improper motivation. *Zupancic*, 174 N.W.2d at 537 (holding that "[c]ontract zoning is illegal not because of the result but because of the method"). Such courts have found it immaterial that notice and hearing procedures occurred, viewing such procedures as pro forma, and have thus held all action taken as a result of the precipitating agreement to be void. *Chung*, 686 So. 2d at 1360.

[¶28.] Other courts, however, recognize that "[p]rivate interests are inherent in any zoning matter; therefore, it is disingenuous to condemn a method of zoning because it benefits private interests in some way." *Dacy*, 845 P.2d at 798; *see also 108 Holdings, Ltd. v. City of Rohnert Park*, 38 Cal. Rptr. 3d 589, 596 (Cal. Ct. App. 2006); *Old Canton*, 749 So. 2d at 57–58; *Citizens for Safety*, 434 S.W.3d at 129. Courts holding this view also point to the fact that judicial review protects private citizens from potential misconduct that might occur through a municipality's exercise of its zoning police power. *Dacy*, 845 P.2d at 798. Therefore, the dispositive question is whether the municipality bargained away its police power, namely whether it lost the crucial element of control. *108 Holdings*, 38 Cal. Rptr. 3d at 596 (examining whether the agreement "amount[s] to a surrender, abnegation, or bargaining away of the City's legislative power"). Similarly, courts addressing this issue consider whether the municipality committed itself to a

specific zoning decision before the hearing, such that the commitment circumvented statutory notice and hearing procedures. *Dacy*, 845 P.2d at 797–98.

[¶29.] With these principles in mind, we review the settlement agreement between the City and Epic. Lamar is correct in that the agreement was premised on the City amending its ordinances. However, these provisions were not self-executing upon ratification of the settlement agreement, and nothing in the agreement prevented the City from performing its duty to act on behalf of the public. In fact, the agreement tied the parties' dismissal of the pending lawsuit to the possibility that any amendment to the ordinances might ultimately fail by conditioning the filing of a dismissal on the actual approval of the ordinances. The settlement agreement also specifically provided that the terms of the agreement were non-severable and that it would terminate—and the parties would be free to continue their underlying litigation—in the event "any term or provision" of the agreement "fails or is held by a court of competent jurisdiction or other competent authority to be invalid, void, or otherwise unenforceable."

[¶30.] Lamar cites *Endres v. Warriner*, 307 N.W.2d 146 (S.D. 1981), for the unremarkable proposition that a contract contingent on a future event is nevertheless valid and enforceable. What Lamar fails to acknowledge, however, is that the enforceability of a contract contingent on a future event is dependent on the agreed upon condition being met. *See, e.g.*, *Johnson v. Coss*, 2003 S.D. 86, ¶ 13 667 N.W.2d 701, 705–06 ("A condition precedent is a contract term distinguishable from a normal contractual promise in that it does not create a right or duty, but instead is a limitation on the contractual obligations of the parties."). Here, the

settlement agreement specifically contemplated that the City's attempt to enact the amendments at issue could fail, under which scenario, the agreement would terminate. Epic would then have no agreement to enforce, and the City and Epic would simply return to the status quo and proceed with their pending lawsuit.

[¶31.] Thus, like the circuit court, we conclude that the settlement here was a lawful conditional agreement, as illustrated by the parties' continuance of the pending litigation until all the agreed-upon contingencies occurred. *See Old Canton*, 749 So. 2d at 58 ("The absence of an enforceable promise by either party distinguishes conditional zoning from contract zoning." (quoting *Dacy*, 845 P.2d at 796)). The City did not, solely by entering into the settlement agreement, commit "to rezone property in such a manner as to circumvent the notice and hearing process or to compromise the rights of affected persons." *See id.*

[¶32.] This, however, does not end the inquiry because Lamar also attacks the validity of the amendments, arguing that the notice and hearing procedures were pro forma. Lamar quotes selected excerpts from the proceedings and asserts that the Council "felt" that it was "obliged to approve the amendments without change because changes would 'complicate the lawsuit[.]'"

[¶33.] The enactment of a municipal ordinance "is a legislative act representing a legislative determination and judgment, and like all legislative enactments a zoning law is presumed to be reasonable, valid and constitutional." *Schrank v. Pennington Cty. Bd. of Comm'rs*, 2000 S.D. 62, ¶ 4, 610 N.W.2d 90, 92; *accord Daily v. City of Sioux Falls*, 2011 S.D. 48, ¶ 11, 802 N.W.2d 905, 910. To overcome this presumption of validity here, Lamar, as the party attacking the

ordinance, must show that the amended sign code "is both unreasonable and arbitrary." *See City of Pierre v. Blackwell*, 2001 S.D. 127, ¶ 9, 635 N.W.2d 581, 584.

[¶34.]    From our review of the record in its entirety, versus the isolated statements quoted by Lamar, the City's notice and hearing proceedings illustrate that the decision to amend resulted from a deliberative legislative process. First, although the settlement agreement prompted the City to propose amendments to the ordinances, the Council was informed of justifications unrelated to the agreement warranting the increase in size and height requirements for certain billboards and the removal of the requirement to obtain additional conditional use authorization for existing signs. Second, a review of the minutes from these hearings reveals that multiple citizens attended and voiced specific reasons for opposing the agreement and the amendments, and that certain council members expressed opposition to amending the ordinances. Finally, the divided vote at these hearings indicates that the Council reached its decision, not as a matter of form, but in contemplation of the best interests of the public as a whole.

[¶35.]    Because the City did not contract away its present or future police powers when it entered into the settlement agreement with Epic, and because Lamar has not established that the City acted unreasonably and arbitrarily when it amended the sign code, the circuit court properly denied Lamar's motion for summary judgment requesting a declaration that the settlement agreement and the ordinance amendments were invalid.

> 2.    *Whether Lamar was required to exhaust its administrative remedies in order to challenge the sign permits.*

[¶36.] Lamar contends the circuit court erred by determining that in order to challenge the issuance of Epic's sign permits, Lamar was required to appeal to the City's Board of Adjustment. Lamar argues that it properly challenged the permits in this declaratory judgment action because the City unlawfully contracted away its police power by purporting to grant the permits via the settlement agreement *before* the City Building Official had even been presented with the permit applications.

[¶37.] Although some of the language of the settlement agreement suggested that the permits would be issued immediately upon the ratification of the agreement, it is undisputed that the two sign permits were not in fact granted contemporaneously to the City's approval of the agreement. The agreement was ratified on April 2, 2018, but Epic did not submit its applications for the sign permits to the City official until August 10, 2018, the date upon which the amendments to the ordinances became effective. Only then did the official responsible for issuing permits approve Epic's requests under the newly adopted regulations.

[¶38.] Lamar nevertheless directs this Court to cases from other jurisdictions for the proposition that a government may not, by settlement agreement, require its officials to act without regard to the controlling zoning ordinances. *See, e.g.*, *The Lamar Co., LLC v. City of Columbia*, 512 S.W.3d 774, 785 (Mo. Ct. App. 2016) (concluding that a settlement agreement was void because "[t]he plain language of the Agreement prohibited the City from enforcing its billboard ordinance"). Here, however, the terms in the settlement agreement pertaining to the two permits follow the provisions in the agreement relating to the necessary amendments to the

sign ordinance upon which the approval of the permits hinged. The agreement also expressly states that "[t]he ratification of this agreement results in no billboards that are already approved or otherwise in existence." If the City had not approved the sign ordinance amendments through its formal process for amending ordinances, Epic would not have been eligible for the sign permits contemplated in the settlement agreement, and the terms relating to the permits would not have been enforceable.

[¶39.]    Because the settlement agreement did not contain language exempting Epic from complying with the City's sign code and did not require the City Building Official to disregard controlling ordinances in determining whether to approve Epic's permit applications, the City did not contract away its duty to issue sign permits in accord with the governing zoning ordinances. Therefore, Lamar's contention that the permits were void *ab initio* is without merit.

[¶40.]    Lamar further argues that notwithstanding the validity of the amended ordinances, it was not required to administratively appeal the City Building Official's decision to issue the sign permits to Epic because there is no evidence the City official considered matters necessary to granting them.[3] In particular, Lamar asserts that Epic's permit for the Deadwood Avenue sign violates the ordinance allowing only the current permit holder to reconstruct an existing off-premises sign. Further, it claims that the City failed to require conditional use

---

3.    Lamar refers to the face of the permit applications, noting that the spaces for the signature of the reviewing official were left blank, as were certain sections requiring findings that the appropriate sign and site information had been provided and that the applications had been approved.

permits for both the Deadwood Avenue and the Dyess Avenue signs when the applications identified them as "new" signs rather than "existing" signs.

[¶41.]     Under SDCL 11-4-19, an aggrieved person has the right to appeal an administrative official's decision "which is not a ministerial act[.]"  The statute further provides that the appeal is to "be taken within a reasonable time, as provided by the rules of such board, by filing with the officer from whom the appeal is taken and with the board of adjustment a notice of appeal specifying the grounds thereof."  *Id.*  Here, the bylaws governing appeals before the Board of Adjustment provide that an "appeal shall be taken within 30 days of the decision of the administrative officer[.]"  *See* Art. V, sec. 2; RCMC § 17.54.010(B)(3)(a).

[¶42.]     Lamar asserts that SDCL 11-4-19 is inapplicable here because the City's issuance of these sign permits to Epic was a ministerial act.  In support of this argument, Lamar cites our definition of "ministerial" in a case involving a county's submission of an initiated zoning ordinance to a public vote, an action mandated by statute.  *See Heine Farms v. Yankton Cty.*, 2002 S.D. 88, ¶ 12, 649 N.W.2d 597, 600 (citation omitted) (defining a ministerial act as one in which "the law requires a public officer to do a specified act in a specified way, upon a conceded state of facts, without regard to his own judgment as to the propriety of the act, and with no power to exercise discretion").  Lamar has not directed this Court to any law or decision holding that a city official's decision to issue permits is a ministerial act, as opposed to one which involves the exercise of that official's own judgment.

[¶43.]     More importantly, the lack of an administrative record from which we can review the legality of the City Building Official's decision to issue the sign

-20-

permits is particularly problematic given Lamar's specific challenges to the City official's actions here. Lamar disputes the official's interpretation of language in the governing ordinances regarding "the current permit holder"; the official's determination whether the signs were in fact "new" or "existing" signs; and the official's corresponding reasoning as to why conditional use permits were not required in conjunction with these sign permits.[4] Had Lamar administratively appealed the issuance of the permits, "[t]he officer from whom the appeal is taken" would have "transmit[ed] to the board all the papers constituting the record upon which the action appealed from was taken." *See* SDCL 11-4-19. Thereafter, a stay of the proceedings (i.e., the issuance of the permits) would have gone into effect under SDCL 11-4-20, and the Board would have held a public hearing on Lamar's appeal as required by SDCL 11-4-21, and issued a decision as allowed under SDCL 11-4-22.[5]

---

4.   Lamar previously held a license to operate a sign at the Deadwood Avenue location. Lamar demolished its sign after a new owner acquired the real estate in 2018 and terminated Lamar's lease. Lamar asserts that after it demolished its sign, the City could not issue Epic a sign permit without requiring that Epic obtain a conditional use permit because Epic was not a *current permit holder*. The City argues in response that the *current permit holder* is the party entitled to rebuild the sign, and when an entity obtains a sign building permit, that entity becomes the *current permit holder*. Therefore, in the City's view, when the City granted Epic the sign permit, Epic became the current permit holder and did not need to obtain a conditional use permit to reconstruct the Deadwood Avenue sign. Because Lamar failed to administratively appeal the City's issuance of the permit, we need not determine the propriety of either argument.

5.   Epic points out the difficulties that would ensue if a holder of a building permit, which has a limited duration, could not rely upon the certainty and finality of a decision of a public body or official due to a collateral attack being allowed outside the timeframes of an administrative appeal.

[¶44.] "The doctrine of exhaustion of administrative remedies is one of the fundamental principles of administrative law and jurisprudence." *Dollar Loan Ctr. of S.D., LLC v. Dep't of Labor and Regulation*, 2018 S.D. 77, ¶ 19, 920 N.W.2d 321, 326 (quoting *Johnson v. Kolman*, 412 N.W.2d 109, 111 (S.D. 1987)). Exhaustion is necessary because it allows "the administrative agency to exercise its discretion, apply its expertise, and make a factual record upon which to base subsequent judicial review." *Id.* (quoting *Read v. McKennan Hosp.*, 2000 S.D. 66, ¶ 12, 610 N.W.2d 782, 785). Here, the City ordinances establish that these types of actions are not ministerial. *See* RCMC § 17.50.080(B) (The Building Official is vested with "the power to render interpretations of this [Rapid City Sign Code] and to adopt and enforce rules and supplemental regulations in order to clarify the application of its provisions."). Therefore, the manner in which the City Building Official exercises his discretion in carrying out these duties must be determined by a review of the administrative record. Lamar's remedy was an appeal to the Board under SDCL 11-4-19. Because Lamar failed to exhaust this administrative remedy, the circuit court properly declined to exercise jurisdiction.

[¶45.] We further conclude that the circuit court properly determined that this case did not present an extraordinary factual situation warranting review despite the failure to exhaust administrative remedies. *See Robinson v. Human Relations Comm'n*, 416 N.W.2d 864, 866 (S.D. 1987) ("Judicial interference [in] administrative proceedings is justified only where the plaintiff has presented an extraordinary factual situation on appeal."). Notably, at the time Lamar commenced its declaratory action, its request that any actions taken pursuant to

the allegedly unlawful settlement agreement be declared void *ab initio* was prospective in nature, given that it pertained to events that had not yet occurred. Lamar was aware that the sign permits were later issued on August 10, 2018, but identifies no reason why it was precluded at that time from exercising its right to administratively appeal this decision to the Board of Adjustment pursuant to the requisite statutory procedures.

[¶46.]       Instead, Lamar asserts that it could not have obtained the relief it was seeking (a declaration that the settlement agreement and the ordinances are invalid) by appealing to the Board of Adjustment. More specifically, Lamar argues that because a board of adjustment does not have the authority to declare an ordinance void, an injured property owner may attack the validity of the ordinances in a direct action in circuit court. Thus, Lamar contends that its declaratory judgment action requesting that the ordinances upon which the permits were issued be declared void was the proper avenue to challenge the validity of the permits.

[¶47.]       Although property owners may challenge the validity of an ordinance through a declaratory judgment action, *see, e.g., Abata*, 2019 S.D. 39, 931 N.W.2d 74, Lamar's challenge to the City's issuance of the sign permits is distinct from its challenge to the validity of the underlying settlement agreement and amendments to the sign code. Challenges to the granting of permits, such as those brought by Lamar here, must be pursued through the administrative process outlined above.[6]

---

6.    Notably, had Lamar unsuccessfully appealed the issuance of the sign permits to the Board, Lamar could have filed a petition for a writ of certiorari challenging the Board's decision in circuit court. As part of that challenge, Lamar could have argued that the permits were improperly issued because,

(continued . . .)

### 3. *The settlement agreement between Lamar and the City.*

[¶48.] By notice of review, Epic argues that the circuit court erred in failing to find the settlement agreement previously entered into between Lamar and the City invalid. Epic's claim originated as an alternative argument advanced in the event the circuit court declared the settlement agreement between Epic and the City invalid. Regardless of how this claim was presented, Epic has neither alleged nor established that the City, by entering into the settlement agreement with Lamar, circumvented the notice and hearing procedures, bargained away its police powers, or acted unreasonably and arbitrarily. Moreover, the provisions in Lamar's agreement regarding the repeal and amendment of specific City ordinances allowed the City to adopt "any reasonable regulations related to off-premises signs . . . in the future." Therefore, we conclude that the circuit court properly denied Epic's alternative claim.

[¶49.] Affirmed.

[¶50.] GILBERTSON, Chief Justice, and JENSEN, SALTER, Justices, and MAYER, Circuit Court Judge, concur.

[¶51.] MAYER, Circuit Court Judge, sitting for KERN, Justice, disqualified.

---

(. . . continued)

in its view, the amended ordinances were invalid. *See, e.g., Wedel v. Beadle Cty. Comm'n*, 2016 S.D. 59, ¶ 16, 884 N.W.2d 755, 759. Although the circuit court cannot declare ordinances invalid in such an appeal, the court can nonetheless consider the validity of the ordinances in resolving challenges to the issuance of permits.