IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT

 THE PARKVIEW VALE, LLC and THE )
 ALMA, LLC, )
 )
 Appellants, )
 WD83729
 v. )
 (Consolidated with WD83730)
 )
 )
 OPINION FILED:
 BOARD OF ZONING ADJUSTMENT )
 March 9, 2021
 FOR THE CITY OF KANSAS CITY, )
 MISSOURI, )
 )
 Respondent. )

 Appeal from the Circuit Court of Jackson County, Missouri
 The Honorable George E. Wolf, Judge

 Before Division Four: Cynthia L. Martin, Chief Judge, and
 Lisa White Hardwick and Mark D. Pfeiffer, Judges

 In this consolidated appeal, The Parkview Vale, LLC (“Parkview”) and The Alma, LLC

(“Alma”) appeal from judgments of the Circuit Court of Jackson County, Missouri (“circuit

court”), affirming decisions by the Board of Zoning Adjustment for the City of Kansas City,

Missouri (“BZA”). Parkview and Alma each own a “six-plex” apartment building, and each filed

an application with the Director of City Planning and Development Department (“Director”)

requesting a certificate of legal nonconformance to allow a seven-unit apartment building. The

Director denied each application, and the BZA affirmed the Director’s decision, but ordered the
Director to issue certificates of legal nonconformance to allow a six-unit apartment building. In

this appeal, Parkview and Alma argue that the certificate of legal nonconformance should have

been granted for seven units. We affirm the circuit court’s judgments affirming the BZA’s

decisions.

 Factual and Procedural Background1

 Parkview and Alma each own a colonnade-style “six-plex” apartment building in

Kansas City, Missouri. Parkview’s building is located at 4225-27 Locust Street, and Alma’s

building is located at 4217-19 Locust Street. The original permit for Parkview was issued in 1913,

and the original permit for Alma was issued in 1915. Each original permit authorized six apartment

units. Each lot is approximately 0.15 acres. The properties are zoned R-1.5. Under current zoning

Lot and Building Standards, a residential development in an R-1.5 zoning district must have a

minimum of 1,500 square feet of lot area per unit.2 § 88-110-06-B, Table 110-2.3

 Parkview and Alma each filed an application with the Director, requesting a certificate of

legal nonconformance to allow a seven-unit apartment building in an R-1.5 zoning district with

insufficient lot area. The Director denied the requests, having determined that each building

presently had “six arranged apartment units. The basement is uninhabitable for human occupancy

and there is no evidence to show that presently there is a 7th unit arranged in the basement.”

 Parkview and Alma each appealed the Director’s decision to the BZA. The two appeals

were consolidated and heard by the BZA on April 9, 2019. At the hearing, a representative of the

City Planning and Development Department testified that the original permits for six units were

 1
 We view the evidence and reasonable inferences therefrom in a light most favorable to the BZA’s decision.
Antioch Cmty. Church v. Bd. of Zoning Adjustment, 543 S.W.3d 28, 34 (Mo. banc 2018).
 2
 Accordingly, under current zoning standards, only four units would be permitted in each building.
 3
 All zoning and development code references are to KANSAS CITY, MO., ZONING AND DEVELOPMENT CODE
(2018), as supplemented, unless otherwise noted.

 2
issued in 1913 and 1915 but that a seventh “basement unit” was added at some point; however,

there was no evidence to indicate whether it was added when the building was constructed or after

that.

 Parkview and Alma agreed that the original building permits authorized a “6 Apt. Flat.”

But, Parkview and Alma offered evidence that the additional unit or units constructed at some

point in the basement of each building were used as quarters for servants who maintained the

building. To explain the discrepancy between the building permits that authorized six units and

the claim that the original buildings actually contained one or two servant quarters in the basement,

Parkview and Alma speculated that the original building permit was never intended to reflect “the

real number of units.” Instead, Parkview and Alma speculated that the “on file” building permit

“was never intended to reflect the Max number of units originally planned and built, rather: it

reflected the minimum (or at least and obvious) number of units built.”

 Larry Dade, owner of Parkview and Alma, testified that he purchased the buildings in the

late 1980s or early 1990s and rented the upper-floor units, but the basement units were never

occupied by tenants because “[t]hey were never in a condition to rent. . . . [T]hey weren’t up to

par to be part [of] our normal apartments by any means.” Mr. Dade testified that he did allow the

basement units to be occupied by “art students that wanted a workplace that they could camp out

from time to time [and] construction workers that . . . needed transitional housing.” He also had a

“business arrangement” with a woman who provided cleaning services for his properties. She did

not have a written lease agreement, but he allowed her to store furniture in the basement of one of

the buildings and occasionally stay in the basement when she needed “a place to stay over the

weekends when she stayed in Kansas City.”

 3
 Mr. Dade testified that he started renovating the buildings in January 2018. He stated that,

at the time of the hearing, the upper units at The Alma were rented but the basement was not. He

testified that the entire Parkview Vale building was vacant and uninhabitable because all of the

plumbing, wiring, heating and air conditioning had been removed.

 The BZA affirmed the Director’s decisions to deny certificates of legal nonconformance

to allow use as seven-unit apartment buildings but ordered the Director to grant to Parkview and

to Alma a certificate of legal nonconformance to allow use as a six-unit apartment building.

 Pursuant to section 89.110,4 Parkview and Alma filed verified petitions in the circuit court

requesting issuance of a writ of certiorari for review of the BZA’s decision. The parties stipulated

that the actions should be consolidated for review based on one consolidated record of proceedings

before the BZA. The circuit court granted the motion to consolidate and issued a writ of certiorari

to the BZA for return of the record of the consolidated hearing before the BZA. After review, the

circuit court entered separate judgments affirming the BZA’s decision.5

 Parkview and Alma timely appealed and we consolidated the appeals.

 Violations of Rule 84.046

 Before addressing Parkview and Alma’s points on appeal, we note that “[a]n appellate

court reviews the findings and conclusions of the BZA and not the judgment of the trial court.”

Antioch Cmty. Church v. Bd. of Zoning Adjustment, 543 S.W.3d 28, 33 (Mo. banc 2018) (internal

quotation marks omitted). Parkview and Alma’s points relied on assert trial court error, thereby

violating Rule 84.04(d)(2), which provides that:

 Where the appellate court reviews the decision of an administrative agency, rather
 than a trial court, each point shall:

 4
 All statutory references are to the REVISED STATUTES OF MISSOURI 2016, as supplemented.
 5
 A party aggrieved by any decision of the BZA may request circuit court review of the BZA’s action. “The
court may reverse or affirm or may modify the decision brought up for review.” § 64.870.2.
 6
 All rule references are to I MISSOURI COURT RULES – STATE 2020.

 4
 (A) Identify the administrative ruling or action the appellant challenges;

 (B) State concisely the legal reasons for the appellant’s claim of reversible error;
 and

 (C) Explain in summary fashion why, in the context of the case, those legal reasons
 support the claim of reversible error.

 We further note that their first point relied on contains multifarious claims of error and,

accordingly, violates Rule 84.04(d). Wennihan v. Wennihan, 452 S.W.3d 723, 728 (Mo. App.

W.D. 2015). “A point relied on should contain only one issue, and parties should not group

multiple contentions about different issues together into one point relied on.” Id. (internal

quotation marks omitted). Here, Parkview and Alma appear to assert that the BZA’s decision was

not supported by competent and substantial evidence because “the record established the

buildings’ nonconforming use and occupancy as seven and not six multi-unit apartment buildings.”

They then appear to claim that the BZA’s decision was not authorized by law because “Kansas City

Missouri ordinances governing loss of a nonconforming use provide that a vacancy of a portion of

the units in a multi-unit building will not be deemed a discontinuance and loss of the

nonconforming use of the building.”

 “Despite this flagrant disregard of the rules, the policy of the appellate courts in this State

is to decide a case on the merits rather than technical deficiencies in the brief.” Id. (internal

quotation marks omitted). “Because we are able to discern the claims being made and the defective

nature of the point[s] relied on does not impede our disposition of the case on the merits, we will

exercise our discretion to attempt to resolve the issues on the merits.” Id. (internal quotation marks

omitted).

 5
 Nonconforming Use

 Before addressing the merits of Parkview and Alma’s appeal, we review the law regarding

nonconforming use. “The term ‘nonconforming use’ means a use of land which lawfully existed

prior to the enactment of a zoning ordinance and which is maintained after the effective date of

the ordinance even though not in compliance with the new use restriction.” Lamar Co., LLC v.

City of Columbia, 512 S.W.3d 774, 788 (Mo. App. W.D. 2016) (internal quotation marks omitted).

“The theory behind the nonconforming use doctrine is that applying new zoning restrictions to

established uses of land would constitute a taking of private property without just compensation

or due process.” Id. (internal quotation marks omitted). “As such, the prior use which is now

considered ‘nonconforming’ is deemed legal or lawful and is allowed to continue albeit in violation

of current zoning laws.” Id. (internal quotation marks omitted).

 The determination of nonconformity status is addressed in section 88-610-01-D of the

Kansas City, Missouri, Zoning and Development Code:

 1. The burden of proving that a nonconformity exists (as opposed to a violation
 of this zoning and development code) rests entirely with the subject landowner.
 The city planning and development director is authorized to determine whether
 adequate proof of nonconforming status has been provided by the subject
 landowner.

 2. Evidence provided must be sufficient to show that the use or structure was
 lawfully established prior to annexation or prior to the adoption of the subject
 regulations and that the lawful use has been continuous and [has] not been
 discontinued.

 3. The city planning and development director’s decision on nonconforming status
 determinations may be appealed in accordance with 88-575.

(Emphasis added.) A “lawfully established” use or building is one that is “in compliance with all

regulations in effect at the time of their establishment.” § 88-610-01-A.

 6
 “[T]he spirit of zoning ordinances always has been and still is to diminish and decrease

nonconforming uses.” Lamar Co., LLC, 512 S.W.3d at 788 (internal quotation marks omitted).

Accordingly:

 Missouri courts . . . allow[ ] municipalities to regulate and limit nonconforming
 uses by various means such as prohibiting the resumption of a nonconforming use
 after its abandonment or discontinuance, prohibiting the rebuilding or alteration of
 nonconforming structures or structures occupied for nonconforming uses, and
 prohibiting or rigidly restricting a change from one nonconforming use to another.

Id. (internal quotation marks omitted).

 If a nonconforming use is discontinued, “its nonconforming status is lost and any

subsequent use of the property must comply with the regulations of the zoning district in which it

is located.” § 88-610-04-D. A nonconforming use is considered discontinued when any of the

following occurs:

 a. the intent of the owner to discontinue all uses in the structure is apparent;

 b. the building or structure ceases to be used in a nonconforming manner for a period
 of 12 consecutive months[;]

 c. no use has been maintained in the structure for a period of 12 months or more;

 d. a demolition permit has been applied for;

 e. all equipment and furnishings have been removed from the premises and have not
 been replaced by similar or other equipment and furnishings within 180 days;

 f. the use was required to obtain a certificate of legal nonconformance and did not
 obtain such certificate within the timeframe required; or

 g. the property has been used for illegal activities or the use has failed to comply with
 city ordinances or with state or federal law.

 h. The vacancy of a portion of the units in a multi-unit building will not be deemed a
 discontinuance of the nonconforming use of the building.

§ 88-610-04-D.

 7
 Standard of Review

 The Missouri Supreme Court has established the scope of our standard of review of a BZA

decision:

 The scope of this Court’s review is governed by article V, section 18 of the Missouri
 Constitution, which provides judicial review of an agency decision “shall include
 the determination whether the [decision is] authorized by law, and in cases in which
 a hearing is required by law, whether the [decision is] supported by competent and
 substantial evidence upon the whole record.” This means the “scope of judicial
 review of the decisions of the board of adjustment in a zoning proceedings is limited
 to a determination of whether the ruling is authorized by law and is supported by
 competent and substantial evidence upon the whole record.”

 The question whether the decision is authorized by law is a legal question this Court
 determines de novo. Determining whether the decision is supported by competent
 and substantial evidence “does not mean that the reviewing court may substitute its
 own judgment on the evidence for that of the administrative tribunal.” Rather, “an
 appellate court must view the evidence and reasonable inferences therefrom in a
 light most favorable to the decision.”

Antioch Cmty. Church, 543 S.W.3d at 33-34 (citations omitted).

 Analysis

 Point I

 Sufficiency of the Evidence Challenge

 In Parkview and Alma’s first point, they assert that the BZA erred in denying their requests

to issue certificates of legal nonconformance because the decision was not supported by competent

and substantial evidence in that “the record established the buildings’ nonconforming use and

occupancy as seven and not six multi-unit apartment buildings.”

 “[A]n agency’s decision is unsupported by competent and substantial evidence only in the

rare case when the decision is contrary to the overwhelming weight of the evidence.” Lynch v.

Franklin Cty., 604 S.W.3d 855, 869 (Mo. App. E.D. 2020) (internal quotation marks omitted).

“We examine whether the agency decision was arbitrary, capricious or unreasonable, or involve[d]

 8
an abuse of discretion.” Id. (internal quotation marks omitted). We defer to the BZA’s view of

the evidence and reasonable inferences therefrom. Id. We may not substitute our own judgment

for that of the BZA; consequently, if the evidence would support either of two different, opposed

findings, we are bound by the BZA’s determination. Id. We also defer to the BZA’s determination

of witness credibility. Id.

 The landowner has the burden of proving that a nonconformity exists. § 88-610-01-D.1.

Accordingly, in order for Parkview and Alma to prove that they were entitled to a certificate of

legal nonconformance for each building as requested, they had the burden to prove: (1) that a

seven-unit residential apartment building had been lawfully established; and (2) that such lawful

use had been continuous and had not been discontinued. § 88-610-01-D.2.

 At the BZA hearing, Parkview and Alma stipulated that the original building permits for

The Parkview Vale and The Alma authorized only six units. They then speculated that even though

the permits authorized only six units, at the time the permits were issued, it was acceptable for the

builder to state fewer than “the real number of units” so the City officials could claim ignorance

as to the existence of ground-level servants’ apartments. To support the contention that the

basement units were part of the original construction of the buildings and used for residential

purposes, Parkview and Alma submitted letters by third parties who did not appear or testify at the

hearing. None of the letters provided evidence that the original building permit misstated the

actual number of authorized units or that the basement units were lawfully established.

 A representative of the City Planning and Development Department testified that the

original permits were issued in 1913 and 1915 for six units; however, there was no evidence to

indicate whether a seventh unit was added when the building was constructed or after that. Thus,

 9
the evidence before the BZA showed that the basements in each building were not lawfully

established by the original permits to be used as residential units.

 Mr. Dade’s testimony was the only evidence as to actual occupancy of the basement units

of the buildings. He testified that he purchased the buildings in the late 1980s or early 1990s and

rented the upper-floor units, but the basement units were never occupied by tenants because “[t]hey

were never in a condition to rent.” He did allow the basement units to be occupied by “art students

that wanted a workplace that they could camp out from time to time [and] construction workers

that . . . needed transitional housing.” He also had a “business arrangement” with a woman who

provided cleaning services for his properties, allowing her to store furniture in the basement of one

of the buildings and occasionally stay in the basement when she stayed in Kansas City over the

weekend. Photographs taken by the City in the basement of each building showed that the

basements were uninhabitable and filled with debris.

 Mr. Dade further testified that he started renovating the buildings in January 2018. He

stated that, at the time of the hearing, the upper units at The Alma were rented but the basement

was not. He testified that the entire Parkview Vale building was vacant and uninhabitable because

all of the plumbing, wiring, heating and air conditioning had been removed. Thus, according to

Mr. Dade’s testimony, the basements in both buildings were never in a condition to rent to tenants

in the thirty years that he owned the buildings. Hence, basement units in the buildings were never

lawfully established and, therefore, were not entitled to protection under the nonconformity

regulations.

 Viewing the evidence and reasonable inferences therefrom in a light most favorable to the

BZA’s decision, as our standard of review requires, the BZA’s decision to order the issuance of

 10
certificates of legal nonconformance for six units—and not seven units—is supported by

competent and substantial evidence upon the whole record.

 Legality Challenge

 In Parkview and Alma’s first point, they also claim that the BZA’s decision was not

authorized by law because “Kansas City Missouri ordinances governing loss of a nonconforming

use provide that a vacancy of a portion of the units in a multi-unit building will not be deemed a

discontinuance and loss of the nonconforming use of the building.”

 Parkview and Alma rely on a subsection of the Zoning and Development Code titled “Loss

of Nonconforming Status,” which provides: “The vacancy of a portion of the units in a multi-unit

building will not be deemed a discontinuance of the nonconforming use of the building.”

§ 88-610-04-D.1.h. Clearly, this provision applies only if a building has already gained

nonconforming status and the nonconforming use is thereafter discontinued. Before Parkview and

Alma applied for certificates of legal nonconformance, they had not established that The Parkview

Vale or The Alma had nonconforming status. The BZA hearing was not about whether The

Parkview Vale and The Alma would lose their status as a nonconforming building, but about

whether Parkview and Alma could prove the nonconforming status of the buildings and, if so, for

how many units.

 The City submitted evidence to the BZA that the buildings were constructed prior to the

adoption of City zoning ordinances and that, at the time of construction, the properties were

considered to have sufficient lots. Parkview and Alma submitted letters from third parties, who

did not appear or testify at the hearing, to support the contention that the basements of the buildings

were used for residential purposes. However, the letters merely contained observations about the

physical structure of the buildings and speculated that the buildings were like many buildings built

 11
in the early 1900s that had servant quarters in the basements. There was no evidence presented

that the basements in the buildings were used as residential units in 1951 when lot requirements

changed to 1,000 square feet per residential unit. Since each lot is approximately 0.15 acres, the

1951 lot requirements allowed only six units in each building. Thus, if the properties had been

seven-unit apartment buildings, they became nonconforming in 1951. There simply is no evidence

in the record that the buildings had previously been granted a nonconforming status.

 The provision relied on by Parkview and Alma clarifies that the vacancy of a portion of the

units in a multi-unit building with nonconforming status is not considered discontinuance of the

nonconforming use and does not result in the loss of the building’s nonconforming status. Neither

Parkview’s nor Alma’s building lost an existing nonconforming status; therefore, they cannot take

shelter in the “Loss of Nonconforming Status” code sections and certainly cannot demonstrate that

the BZA misapplied the provision.

 The BZA’s decision that Parkview and Alma established the nonconforming status of their

buildings for six units—and not seven units—was supported by the evidence and authorized by

law.

 Point I is denied.

 Point II

 In Parkview and Alma’s second point, they assert that the BZA erred in relying on the

building permits to determine that they failed to meet their burden to prove that residential use of

the basements was lawfully established because there were no zoning ordinances in effect when

the buildings were originally constructed that would have prevented seven units in each building.

 Section 88-610-01-D.1 provides that the landowner has the burden of proving that a

nonconformity exists. The landowner’s evidence must show that “the use or structure was lawfully

 12
established.” § 88-610-01-D.2. A use or structure is lawfully established when it is “in compliance

with all regulations in effect at the time of their establishment.” § 88-610-01-A (emphasis added).

The BZA heard testimony from and was presented evidence by City staff and Mr. Dade that the

original building permits only authorized six units. Though Parkview and Alma presented

speculative evidence that basement units were often used as “servant quarters” in similar buildings

built in Kansas City in the early 1900s, Parkview and Alma did not provide evidence to the BZA

that basement residential units were actually resided in—let alone establish that they were used

continuously for residential purposes. Thus, it was not error for the BZA to rely on the original

building permits to conclude that Parkview and Alma failed to meet their burden to prove that

residential use of the basements was lawfully established.

 Point II is denied.

 Point III

 In Parkview and Alma’s third and final point, they assert that the trial court erred in

upholding the BZA’s decision by considering for the first time on judicial review the issue “that

the buildings were not lawfully occupied” as seven-unit apartment buildings because the building

permits authorized only six units for each building in that the BZA did not consider that issue when

it rendered its decision.7 Parkview and Alma contend that the BZA first argued in the circuit court

that their applications for certificates of nonconformance were denied because the buildings did

not comply with the building permit description as a six-plex and, therefore, the basement seventh

unit was “illegally created,” which made the buildings illegal and disqualified them for

nonconforming status.

 7
 As we have pointed out, “[a]n appellate court reviews the findings and conclusions of the BZA and not the
judgment of the trial court.” Antioch Cmty. Church, 543 S.W.3d at 33 (internal quotation marks omitted). Parkview
and Alma’s point relied on asserts trial court error, thereby violating Rule 84.04(d)(2).

 13
 The burden to prove a lawful nonconforming use was upon Parkview and Alma. It was

their burden to show that the use of their building as a seven-unit apartment building “complied

with all regulations in effect at the time of their establishment.” § 88-610-01-A. The regulations

impose no burden on the City to prove that the use was not lawfully established. Rather, the

regulations authorize the Director to determine whether the landowner provided adequate proof of

nonconforming status. § 88-610-01-D.1. The evidence before the BZA, including testimony from

City staff and Mr. Dade, was that the original building permit for each building was for six units;

the permits did not authorize a seventh basement unit. This evidence was not considered for the

first time in the circuit court.

 Point III is denied.

 Conclusion

 We affirm the circuit court’s judgments affirming the BZA’s decisions.

 /s/Mark D. Pfeiffer
 Mark D. Pfeiffer, Judge

Cynthia L. Martin, Chief Judge, and Lisa White Hardwick, Judge, concur.

 14